**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DARREN DAVID CHAKER,
  *Petitioner-Appellant,*

v.

ALAN CROGAN; SAN DIEGO
PROBATION DEPARTMENT; PEOPLE OF
THE STATE OF CALIFORNIA,
  *Respondents-Appellees.*

No. 03-56885

D.C. No.
CV-00-02137-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
December 6, 2004—Pasadena, California

Filed November 3, 2005

Before: Procter Hug, Jr., Harry Pregerson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

15095

## COUNSEL

Walter K. Pyle, Berkeley, California, for the petitioner-appellant.

Kelly M. Rand, Deputy District Attorney, San Diego, California, for the respondents-appellees.

Mark D. Rosenbaum (argued), Alan L. Schlosser, Los Angeles, California, and Daniel P. Tokaji (briefed), Columbus, Ohio, for ACLU of San Diego and Imperial Counties, ACLU of Southern California and ACLU of Northern California.

Everett L. Bobbitt (briefed), Bobbitt & Pinckard, San Diego, California, for El Cajon Police Officers Assn., San Diego County Deputy Sheriff's Assoc. and San Diego Police Officers Assn.

Michael D. Schwartz (briefed), Ventura, California, for California District Attorney's Assoc.

Christopher D. Lockwood (argued), Joseph Arias (briefed), Arias, Lockwood & Gray, San Bernardino, California, for City of San Bernardino.

Alison Berry Wilkinson (briefed), Rains, Lucia & Wilkinson, Pleasant Valley, California, for Peace Officers Research Assoc. of California Legal Defense Fund.

Kent S. Scheidegger (briefed), Sacramento, California, for Criminal Justice Legal Foundation.

Michael R. Capizzi (argued), Krista McNevin Jee (briefed), Fullerton, California, for California State Sheriff's Assn., California Police Chief's Assn. and California Peace Officers Assn.

---

**OPINION**

PREGERSON, Circuit Judge:

Darren David Chaker appeals the district court's denial of his habeas corpus petition brought under 28 U.S.C. § 2254. Chaker was convicted by a jury for filing a knowingly false complaint of peace officer misconduct in violation of California Penal Code section 148.6(a)(1). In his habeas corpus petition, Chaker alleges that California Penal Code section 148.6 violates the First Amendment. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

As discussed below, a formal complaint of peace officer misconduct triggers a mandatory investigation conducted by the peace officer's employing agency. Within the limited context of that investigation, section 148.6 criminalizes know-

ingly false speech critical of peace officer conduct, but leaves
unregulated knowingly false speech supportive of peace offi-
cer conduct. Because we conclude that the statute impermiss-
ibly discriminates on the basis of a speaker's viewpoint in
violation of the First Amendment, we reverse the district court
and grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND

On April 9, 1996, El Cajon Police Officers Bill Bradberry
and Terry Johnston arrested Chaker for theft of service for
retrieving his car from a mechanic without paying. Several
months later, on August 15, 1996, Chaker filed a claim for
damages form with the City of El Cajon alleging that Officer
Bradberry injured him during the arrest. Specifically, Chaker
alleged that Officer Bradberry hit him in the ribs, twisted his
wrist, and failed to secure Chaker in the police vehicle with
a seat belt so that Chaker struck his head during sudden stops.[1]
Chaker also sent a letter directly to the El Cajon Police
Department Internal Affairs Division, dated March 23, 1997,
making the same complaint. In addition to the preceding alle-
gations, Chaker alleged that he was strip-searched by Detec-
tive Bradberry. Chaker signed the March letter under penalty
of perjury.

In March 1998, the San Diego District Attorney's office
filed a misdemeanor criminal complaint against Chaker in
state court. The complaint charged Chaker with the misde-
meanor offense of filing a knowingly false allegation of peace
officer misconduct in violation of California Penal Code sec-

---

[1]Chaker described Officer Bradberry's conduct as follows: (1) "Unlaw-
ful use of force. Det. Bill Bradberry [used] force by hitting me, twisting
[my] wrist, when he arrested me," (2) "[o]n or about April 8, 1996 at 1
pm. I complied [with the] arrest but Det. Bradberry hit me on my ribs any-
way," (3) "Det. Bradberry's use of force damaged my wrist, ribs," (4)
"Det. Bradbery did not seat belt me in when transported — he braked so
I hit the dashboard. Ribs hurt, [wrist]" Chaker requested $25,000 in dam-
ages from the City of El Cajon.

tion 148.6(a)(1). At the ensuing jury trial, Officers Bradberry and Johnston testified and denied using excessive force against Chaker. A witness to the arrest testified that the arrest appeared to be routine. She stated that from her vantage point, Chaker did not seem to be in any pain during the arrest. Finally, the Internal Affairs Officer responsible for investigating Chaker's complaint testified and authenticated the letter submitted by Chaker to the El Cajon Police Department.

At trial, the court admitted a civil complaint in a lawsuit filed by Chaker against Officer Bradberry. The complaint contained a claim for slander arising out of an encounter between Officer Bradberry and Chaker on April 11, 1996, two days after Officer Bradberry arrested Chaker for theft of services.[2] The court reasoned that the state could use the complaint as evidence of what was "not on it," for example, any discussion of Officer Bradberry's alleged use of excessive force during Chaker's April 9, 1996, arrest.[3]

On February 22, 1999, the jury found Chaker guilty of violating section 148.6(a)(1). The court sentenced Chaker to two days of custody with credit for time served, fifteen days of public service, and three years of probation. The court also ordered Chaker to pay a fine and restitution totaling $1142.

Chaker appealed his conviction to the San Diego County Appellate Division of the Superior Court. That court affirmed his conviction. Rather than continue his direct appeal, Chaker

---

[2]Prior to trial, the court excluded evidence of between ten or twelve suits filed by Chaker against other law enforcement agencies. The court also excluded evidence that Chaker had been declared a vexatious litigant in another lawsuit.

[3]The court also admitted a statement made by Chaker to an attorney in an unrelated lawsuit against a different El Cajon Police Officer. According to the attorney, Chaker said, "If all that happens in this case is that the City of El Cajon has to pay your fee of $20,000, and that prevents the City from purchasing one or two patrol cars, then that is an acceptable result to me."

filed a habeas corpus petition in Superior Court, and then another in the California Supreme Court, alleging ineffective assistance of both trial and appellate counsel. Both courts denied his petitions. Chaker filed a second habeas petition in the California Supreme Court on December 26, 2000, this time alleging denial of the right to self-representation. This petition was denied as well.

On October 23, 2000, Chaker filed a pro se habeas petition in federal district court alleging various problems with his state conviction. While his federal habeas petition was pending before the district court, Chaker filed his third state habeas petition with the California Supreme Court on September 10, 2001.

In his third state habeas petition, Chaker raised for the first time a First Amendment challenge to section 148.6. This petition was also denied, and the order denying the petition cited California cases concerning procedural default. After the California Supreme Court rejected Chaker's First Amendment challenge, he raised the claim in his February 25, 2002, amended federal habeas petition.

On November 8, 2002, Chaker moved for summary judgment on his First Amendment claim. The magistrate judge issued a Report and Recommendation recommending denial of Chaker's habeas petition. The district court adopted in part the conclusions of the magistrate judge, denied the petition, and issued a limited certificate of appealability on Chaker's First Amendment claim.

## ANALYSIS

### I. *Procedural Issues and Standard of Review*

The state and amicus curiae supporting the state raise several issues potentially barring our review of Chaker's habeas petition. The state argues that we lack jurisdiction because

Chaker was no longer serving his probation at the time of this appeal. The state also contends that the present appeal is moot because Chaker is not suffering any significant collateral consequences from his conviction. Finally, amicus curiae Criminal Justice Legal Foundation ("CJLF") argues that because Chaker failed to raise his First Amendment claim while he was still in custody, the district court lacked jurisdiction over Chaker's First Amendment claim. We resolve these issues before addressing the merits of Chaker's First Amendment claim.

## A. *Jurisdiction*

**[1]** The state argues that we should dismiss Chaker's petition for lack of jurisdiction because Chaker is no longer on probation, and thus is not "in custody" for habeas purposes. The state is correct that "[f]or a federal court to have jurisdiction over a habeas petition filed by a state prisoner, the petitioner must be 'in custody.' " *Zichko v. Idaho*, 247 F.3d 1015, 1019 (9th Cir. 2001). Nonetheless, if a petitioner is in custody at the time he files his federal habeas petition, his subsequent release from custody does not deprive the court of its jurisdiction. *See Carafas v. LeVallee*, 391 U.S. 234, 238 (1968); *United States v. Spawr Optical Research, Inc.*, 864 F.2d 1467, 1470 (9th Cir. 1988). Furthermore, a petitioner is "in custody" for the purposes of habeas jurisdiction while he remains on probation. *Id.*; *see also Jackson v. Coalter,* 337 F.3d 74, 79 (1st Cir. 2003). Thus, because Chaker was still serving his probation on the date he filed his habeas petition in federal court, we have jurisdiction over this appeal.

## B. *Mootness*

**[2]** The state next argues that this case is moot, contending that Chaker is no longer suffering any significant collateral consequences as a result of his misdemeanor criminal conviction. This argument is foreclosed by *Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994), *overruled on other grounds*, 8

U.S.C. § 2254(c). In *Chacon*, we recognized an irrebutable presumption that collateral consequences result from any criminal conviction. *See id.* We explained that "[o]nce convicted, one remains forever subject to the prospect of harsher punishment for a subsequent offense as a result of federal and state laws that either already have been or may eventually be passed." *Id.*; *accord Wood v. Hall*, 130 F.3d 373, 376 (9th Cir. 1997); *Larche v. Simons*, 53 F.3d 1068, 1070-71 (9th Cir. 1995). Because Chaker faces the prospect of harsher punishment at a later date as a result of his conviction under section 148.6, his claim continues to present a live controversy.[4]

## C. *Statute of Limitations*

Federal habeas petitions ordinarily must be filed within one year of the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A); *see Mayle v. Felix*, 125 S. Ct. 2562, 2573 (2005) (quoting statute).

Chaker's conviction was affirmed on direct review by the San Diego County Appellate Division of the Superior Court on October 15, 1999. He did not directly appeal that decision. Thus, Chaker's conviction became final after the thirty day time period for filing a notice of appeal lapsed. *See* Cal. R. Ct. 182(a). He filed his federal habeas petition on October 23, 2000, within one year of the date his state conviction became final.

It was not until Chaker filed his second amended petition, filed nunc pro tunc on February 25, 2002, that he raised his First Amendment challenge to section 148.6. Chaker's second

---

[4]The state also argues that Chaker lacks standing to attack his conviction on First Amendment grounds. We disagree. Chaker has shown "that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *See Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2308 (2004) (citations omitted).

amended petition, filed more than two years after his conviction became final, was therefore filed long after the applicable statute of limitations ran. Amicus curiae CJLF contends that Chaker's First Amendment claim, found in his second amended petition, does not "relate back" to his initial petition within the meaning of Federal Rule of Civil Procedure 15(c)(2),[5] and is therefore time barred by the applicable one year statute of limitations. *See Mayle*, 125 S. Ct. at 2573-75 (concluding that claims in petitioner's amended habeas corpus petition did not "relate back" to initial petition within the meaning of Rule 15(c)(2), and were therefore barred by applicable one year statute of limitations).

Even so, the state failed to raise a statute of limitations defense to Chaker's First Amendment claim in federal district court, thereby waiving it. *See Nardi v. Stewart*, 354 F.3d 1134, 1141 (9th Cir. 2004) (holding that the statute of limitations set forth in 28 U.S.C. § 2244(d)(1)(A) is an affirmative defense "that the state waives . . . by filing a responsive pleading that fails to affirmatively set forth the defense"). Moreover, the state does not discuss the statute of limitations anywhere in its brief before this court. Accordingly, we decline to consider an argument raised only by CJLF on appeal. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998) (declining to address argument because "as [amicus curiae] candidly acknowledges, it is raised for the first time on appeal, and not by any party"); *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993) ("Generally, we do not consider on appeal an issue raised only by an amicus.").

---

[5]Federal Rule of Civil Procedure 15(c)(2) provides, in part, that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2).

### D. *Procedural Default and Standard of Review*

Generally, under the provisions of the Antiterrorism and Effective Death Penalty Act, a federal habeas court reviews a state court's decision to determine whether the state decision was " 'contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.' " *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).

In this case, however, Chaker's First Amendment claim was never decided on the merits in a state court. Rather, the California Supreme Court denied Chaker's First Amendment claim without opinion, citing cases relating to procedural default.

Procedural default normally constitutes an adequate and independent state ground precluding federal court review of a habeas petition. *See Zichko*, 247 F.3d at 1021. But the state did not raise the issue of procedural default in district court or on appeal. Consequently, the state waived its procedural default defense by failing to raise the issue in response to Chaker's habeas petition. *See Franklin v. Johnson*, 290 F.3d 1223, 1229 (9th Cir. 2002). Moreover, though we may sua sponte dismiss Chaker's petition as procedurally barred, *see Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003), we decline to do so as "the state provides no explanation whatsoever for its failure to raise a procedural default argument in the district court, much less any extraordinary reason for reaching the procedural default defense despite the state's failure to raise the issue below," *Franklin*, 290 F.3d at 1233.

Thus, although we are not precluded from ruling on the merits of Chaker's claim due to his procedural default, there is no state court ruling on the merits of Chaker's First Amendment claim. There is therefore no state decision to review to determine whether the decision was "contrary to, or involved an unreasonable application of, clearly established federal

law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In such a circumstance, we review the district court's decision de novo without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *See Hudson v. Hunt*, 235 F.3d 892, 895 (4th Cir. 2000) (applying de novo standard of review to a claim in a habeas petition that was not adjudicated on the merits by the state court); *Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000) (same); *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999) (same). "To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).

## II. *California Penal Code section 148.6 and the First Amendment*

### A. *California Penal Code section 148.6*

**[3]** California Penal Code section 148.6 makes it a misdemeanor to "file[ ] any allegation of misconduct against any peace officer . . . knowing the allegation to be false." Cal. Penal Code § 148.6(a)(1). Any law enforcement agency that accepts an allegation of misconduct against a peace officer must require the complainant to read and sign an advisory statement warning the complainant in boldface type, in part, "IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE."[6] Cal. Penal Code § 148.6(a)(2).

---

[6]The full advisory, which must be written in boldface type, provides:

YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER FOR ANY IMPROPER POLICE CONDUCT. CALIFORNIA LAW REQUIRES THIS

The California Legislature enacted section 148.6 in 1995, Stats. 1995, ch. 590 Section 1; Assem. Bill No. 1732 (1995-1996 Reg. Sess.), partly in response to a perceived gap created by several state court decisions construing Penal Code section 148.5. *See People v. Stanistreet*, 29 Cal. 4th 497, 502 (2002). Section 148.5 makes it a misdemeanor to report a suspected felony or misdemeanor knowing the report of criminal activity to be false. *See id.* California courts, however, construed section 148.5 as not reaching complaints of police misconduct. *See id.* (citing *Pena v. Mun. Court*, 96 Cal. App. 3d

AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS' COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.

IT IS AGAINST THE LAW TO MAKE A COMPLAINT THAT YOU KNOW TO BE FALSE. IF YOU MAKE A COMPLAINT AGAINST AN OFFICER KNOWING THAT IT IS FALSE, YOU CAN BE PROSECUTED ON A MISDEMEANOR CHARGE.

Cal. Penal Code § 148.6(a)(2).

Chaker never signed this advisory before making his complaint. Rather, he sent in an informal letter to the El Cajon Police Department, signed under penalty of perjury, complaining of Officer Bradberry's conduct. It was Chaker's letter that formed the basis of his prosecution under section 148.6.

Chaker argued that signing the advisory was an element of the offense, and he challenged his conviction on that basis in both his state and federal habeas petitions. But the state courts and the district court ruled against Chaker on this claim. Accordingly, we presume for the purposes of this appeal that signing the advisory was not an essential element of the offense.

77, 83 (1979), and *People v. Craig*, 21 Cal. App. 4th Supp. 1, 3, 6 (1993)).

In *Pena*, the California Court of Appeal noted that

Allowing police officials to prosecute a citizen for filing a complaint against an officer . . . by using the provisions of Penal Code section 148.5 would have the tendency to "chill" the willingness of citizens to file complaints, particularly on weak evidence and when the same entity against which the complaint is made will be investigating the accusations.

96 Cal. App. 3d at 83. The court therefore concluded that "the Legislature did not intend citizens' complaints to a law enforcement entity concerning the conduct of that entity or its officers . . . to be within the definition of a police report for the purposes of Penal Code section 148.5." *Id*. Thus, "section 148.6 fills the gap" by covering "all citizens' complaints of police misconduct during the performance of an officers' duties that may or may not rise to the level of a criminal offense." *Stanistreet*, 29 Cal. 4th at 503 (internal quotation marks and citation omitted).

According to the California Supreme Court, the sanction imposed by section 148.6 is unique in California's statutory scheme. As the California Supreme Court recognized, "section 148.6 gives protection to peace officers that the Legislature has not given to others," observing that "[i]t is not a crime to knowingly make such an accusation against a firefighter, a paramedic, a teacher, an elected official, or anyone else." *Id*. (internal quotation marks and citation omitted).

Similarly, California law imposes a unique complaint process and record-keeping requirement for complaints of peace officer misconduct. Specifically, California Penal Code section 832.5 provides that "[e]ach department or agency in this state that employs peace officers shall establish a procedure

to investigate complaints by members of the public . . . and shall make a written description of the procedure available to the public." Cal. Penal Code § 832.5(a)(1). Section 832.5 also requires that such complaints be retained for five years, unless the complaints are "determined to be frivolous, unfounded, or exonerated" by the peace officer's employing agency, in which case the complaint "shall not be maintained in that officer's general personnel file."[7] Cal. Penal Code § 832.5(b), (c).

[4] In enacting section 148.6, the California legislature was motivated in part by the perceived abuse of citizen complaint procedures by "less ethical citizens." As one court summarized,

> [t]he Legislature noted that since the Rodney King incident in March 1991, law enforcement agencies throughout the state had 'revised their citizen complaint procedures to promote greater accountability on the part of their line officers.' (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1732 (1995-1996 Reg. Sess.).) However, a "glaringly negative side-effect which has resulted [was] the willingness on the part of many of our less ethical citizens to maliciously file false allegations of misconduct against officers in an effort to punish them for simply doing their jobs." (Ibid.) Against this backdrop, the Legislature enacted section 148.6, in an attempt to curb a perceived rising tide of knowingly false citizens' complaints of misconduct by officers performing their duties.

---

[7]Use and discovery of complaints of peace officer misconduct is limited. Employing agencies "shall not use the complaints . . . for punitive or promotional purposes" except as permitted under specific disciplinary procedures set forth by statute. Cal. Penal Code § 832.5(c). Furthermore, a party seeking discovery of such complaints in any civil or criminal proceeding must provide notice to the employing agency and show "good cause" for the discovery; otherwise such records are confidential. *See* Cal. Penal Code § 832.7; Cal. Evid. Code § 1043.

*San Diego Police Officers Ass'n. v. San Diego Police Dep't.*, 76 Cal. App. 4th 19, 23 (1999). Numerous law enforcement agencies throughout the state supported the enactment of section 148.6.[8]

## B. *Viewpoint Discrimination and the First Amendment*

Chaker argues that section 148.6 impermissibly discriminates on the basis of viewpoint in violation of the First Amendment. While he concedes that knowingly false speech regarding a public official is generally unprotected by the First Amendment, *see Garrison v. Louisiana*, 379 U.S. 64 (1964); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), he argues that the statute impermissibly singles out speech critical of peace officers for special criminal sanction.[9] Because section 148.6 applies only to the filing of a formal complaint of peace officer misconduct with an agency employing peace officers, our First Amendment analysis focuses solely on the application of section 148.6 within the context of the complaint investigation process.

[5] The protections afforded by the First Amendment, made applicable to the States by the Fourteenth Amendment, are not absolute and the government may regulate certain categories of expression consistent with the Constitution. *See Virginia v. Black*, 538 U.S. 343, 358 (2003). For example, "fighting

_____

[8]We grant Chaker's motion for judicial notice, in which he requests we take judicial notice of the legislative history of § 148.6. *See* Fed. R. Evid. 201(b).

[9]Several courts have already addressed this precise issue. The California Supreme Court rejected a First Amendment challenge to section 148.6 similar to the instant challenge. *See Stanistreet*, 29 Cal. 4th at 512. One federal district court, however, held that the statute is an impermissible content-based and viewpoint-based regulation of speech in violation of the First Amendment. *See Hamilton v. City of San Bernardino*, 325 F. Supp. 2d 1087 (C.D. Cal. 2004); *see also Eakins v. Nevada*, 219 F. Supp. 2d 1113 (D. Nev. 2002) (striking down analogous provision of Nevada law on First Amendment grounds).

words," defamation, and obscenity, are "not within the area of constitutionally protected speech," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (citations omitted), because "such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

**[6]** Nevertheless, these categories of speech are not rendered "entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *R.A.V.*, 505 U.S. at 383-84; *see also Black*, 538 U.S. at 361. "Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *R.A.V.*, 505 U.S. at 384; *see id.* (rejecting the notion that "a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government").

The leading case establishing the First Amendment's application to proscribable classes of speech is *R.A.V.*. In *R.A.V.*, the Supreme Court considered the constitutionality of a Minnesota statute banning certain symbolic expression, including cross burning, when done with the knowledge that such conduct would " 'arouse[ ] anger, alarm or resentment in others on the basis of race, color, creed, religion or gender.' " 505 U.S. at 380 (quoting Minnesota statute). The Court first recognized that, as construed by the Minnesota Supreme Court, the statute only reached "fighting words," thereby limiting the statute's reach to a category of speech generally unprotected by the First Amendment. *See id.* at 380-81.

Even with the limiting construction, however, the Court concluded that the statute was an impermissible content-based regulation of speech. The Court noted that "[d]isplays con-

taining abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics," such as race, color, creed, religion, or gender. *Id*. at 391. The Court further explained that those "who wish to use 'fighting words' in connection with other ideas — to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality — are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects." *Id*.

The Court further held that the statute impermissibly discriminated on the basis of viewpoint. *See id.* ("In its practical operation, moreover, the ordinance goes even beyond mere content discrimination, to actual viewpoint discrimination."). The Court reasoned that

> Displays containing some words — odious racial epithets, for example — would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender — aspersions upon a person's mother, for example — would seemingly be usable *ad libitum* in the placards of those arguing *in favor* of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying, for example, that all 'anti-Catholic bigots' are misbegotten; but not that all 'papists' are, for that would insult and provoke violence 'on the basis of religion.' St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

*Id*. at 391-92.

Finally, the Court held that the statute was not narrowly tailored to meet the state's compelling interest in ensuring "the

basic human rights of members of groups that have historically been subjected to discrimination." *Id*. at 395. The Court concluded that "[a]n ordinance not limited to the favored topics, for example, would have precisely the same beneficial effect" as the impermissible content-based statute. *See id*. at 396.

The Court revisited *R.A.V.* in *Virginia v. Black*. In *Black*, two defendants challenged the constitutionality of a Virginia statute making it a crime to burn a cross with the intent to intimidate, contending that the statute fit within the Court's holding in *R.A.V. See Black*, 538 U.S. at 360-63. In rejecting the defendants' First Amendment challenge, the Court noted first that "some types of content discrimination [do] not violate the First Amendment." *Id*. at 361. For example, where "the basis for the content discrimination consists of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." *Id*. at 361-62 (quoting *R.A.V.*, 505 U.S. at 388).

The Court distinguished its decision in *R.A.V.*, and explained that the Virginia statute was directed at *all* cross burning done with the intent to intimidate. *See id*. at 362. Because the Virginia statute did not distinguish between intimidation based on a victim's race, gender, or religion, unlike the ordinance at issue in *R.A.V.*, there was no significant threat that the state "single[d] out for opprobrium only that speech directed toward 'one of the specified disfavored topics.' " *Id*. (quoting *R.A.V.*, 505 U.S. at 391).

The Court also concluded that the Virginia statute did not violate the First Amendment "because burning a cross is a particularly virulent form of intimidation." *Id*. at 363. It therefore concluded that "just as a State may regulate only that obscenity which is the most obscene due to its prurient content, so too may a State choose to prohibit only those forms of intimidation that are most likely to inspire fear of bodily harm." *Id*.

**[7]** Just as in *R.A.V.*, the category of speech at issue in this case — knowingly false speech regarding a public official — is "not within the area of constitutionally protected speech." *R.A.V.*, 505 U.S. at 383. As the Supreme Court made clear in its landmark decision in *New York Times*, a public official may recover damages for a defamatory falsehood if he or she can prove "that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. That same standard has been applied in the context of state criminal libel laws where a public official is concerned. *See Garrison*, 379 U.S. at 74 ("The constitutional guarantees of freedom of expression compel application of the [*New York Times*] standard to the criminal remedy."). Indeed, it is well-established that knowing falsehoods are constitutionally unprotected because they are "at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id.* at 75.

**[8]** Thus, it is clear that the state may prohibit knowingly false speech made in connection with the peace officer complaint process. As the state correctly points out, knowingly false complaints of peace officer misconduct cause valuable state resources to be expended investigating false claims rather than investigating valid claims. *See Stanistreet*, 29 Cal. 4th at 509 ("This requirement of an investigation [imposed by section 832.5], and the resulting investigation itself, can have substantial effects. Public resources are required to investigate these complaints, resources that could otherwise be used for other matters . . . ."). Furthermore, false complaints knowingly made against a peace officer may lead to unwarranted sanctions against the officer. Section 148.6 therefore furthers the state's interest in preventing potential discipline against innocent peace officers.

**[9]** Nevertheless, following both *R.A.V.* and *Black*, we must determine whether California Penal Code section 148.6 vio-

lates the First Amendment's core requirement of viewpoint neutrality even though the statute regulates otherwise unprotected speech. *See Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 282 n.12 (2d Cir. 1997) ("*R.A.V.* provides that the First Amendment's prohibition against viewpoint discrimination applies to *both* protected and unprotected speech."). This requires us to consider whether the statute "regulate[s] speech in ways that favor[s] some viewpoints or ideas at the expense of others." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). Stated differently, our task is to determine whether "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). We also find instructive nonpublic forum cases in which the Supreme Court has repeatedly reminded us that "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).

**[10]** We begin our analysis by recognizing that a knowingly false assertion made by a peace officer or witness in support of a peace officer during the course of a misconduct investigation, like a knowingly false complaint of misconduct, is equally "at odds with the premises of democratic government." *Garrison*, 379 U.S. at 75. In most cases, "it inevitably will come down to the word of the citizen against the word of the police officer or officers, in which case law enforcement authorities will conduct an investigation to determine who is telling the truth." *Stanistreet*, 29 Cal. 4th at 513-14 (Werdegar, J., concurring). Consequently, a peace officer or witness who lies during an investigation is equally to blame for wasting public resources by interfering with the expeditious resolution of an investigation. As one California court noted, the state developed its citizen complaint procedures "to promote greater accountability on the part of [its] line offi-

cers." *San Diego Police Officers Ass'n.*, 76 Cal. App. 4th at 23 (quoting Assem. Comm. on Public Safety, Analysis of Assem. Bill No. 1732 (1995-1996 Reg. Sess.). Section 148.6, however, undermines that goal by holding only citizen *complainants* accountable for their knowing falsehoods, while leaving unregulated the knowingly false speech of a peace officer or witness.

**[11]** The state's asserted interest in saving valuable public resources and maintaining the integrity of the complaint process is therefore called into question by its choice to prohibit only the knowingly false speech of those citizens who complain of peace officer conduct. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994) ("Exemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place."). The Supreme Court has looked skeptically on statutes that exempt certain speech from regulation, where the exempted speech implicates the very same concerns as the regulated speech. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (noting that statute at issue was "so woefully underinclusive" that the state's asserted interest in the statute was "a challenge to the credulous"); *Florida Star v. B.J.F.*, 491 U.S. 524, 540, (1989) ("[T]he facial underinclusiveness" of a regulation of speech "raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."). While there is no general First Amendment prohibition on the under-inclusive regulation of speech, *see R.A.V.*, 377 U.S. at 387, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people,' " *City of Ladue*, 512 U.S. at 51 (quoting *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 785-86 (1978)); *see also Moser v. F.C.C.*, 46 F.3d 970, 974 (9th Cir. 1995).

The statute's under-inclusiveness is particularly troublesome in this case because section 148.6 is necessarily limited

to criticism of government officials — peace officers. "Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government," *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004), because "[c]riticism of government is at the very center of the constitutionally protected area of free discussion," *Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966). *See also City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *New York Times*, 376 U.S. at 270 (recognizing the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). The imbalance generated by section 148.6—i.e., only individuals *critical* of peace officers are subject to liability and not those who are supportive—therefore turns the First Amendment on its head.

An illustration drawn from this case may be helpful. At Chaker's criminal trial, the witness who observed Chaker's arrest testified that she saw no signs of excessive force during Chaker's arrest. However, had the witness made this statement to the investigator charged with investigating Chaker's complaint, knowing the statement to be false, the witness would not have faced criminal sanction under section 148.6. Similarly, had Officer Bradberry made a knowingly false statement to the investigator charged with investigating Chaker's complaint, Officer Bradberry would not have faced criminal sanction under section 148.6. It is only Chaker, who filed a complaint of peace officer misconduct complaining that Officer Bradberry mistreated him in the course of an arrest, who faced criminal liability under section 148.6 for his knowing falsehood.

**[12]** For these reasons, we find the Supreme Court's analysis in *R.A.V.* controlling. Like the ordinance at issue in *R.A.V.*,

section 148.6 regulates an unprotected category of speech, but singles out certain speech within that category for special opprobrium based on the speaker's viewpoint. Only knowingly false speech *critical* of peace officer conduct is subject to prosecution under section 148.6. Knowingly false speech *supportive* of peace officer conduct is not similarly subject to prosecution. California "has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules." *See R.A.V.*, 505 U.S. at 392. Because section 148.6 targets only knowingly false speech *critical* of peace officer conduct during the course of a complaint investigation, we conclude that the statute impermissibly regulates speech on the basis of a speaker's viewpoint.[10] *See id.* at 384; *see also Hamilton v. City of San Bernardino*, 325 F. Supp. 2d 1087, 1094 (C.D. Cal. 2004).

At oral argument, the state and amicus curiae in support of the state offered three statutes which they believe regulate knowingly false speech of peace officers during the course of a misconduct investigation: California Penal Code sections 118.1, 132, and 134. They argued that these statutes put peace officers on equal footing with complainants in the course of a complaint investigation. Section 118.1, however, only prohibits an officer from filing a *crime report* if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false.[11] *See* Cal. Penal Code § 118.1; *see also Walker v. Kiou-*

---

[10]Because we conclude that section 148.6 discriminates on the basis of viewpoint, we need not reach the remaining arguments offered by Chaker and amicus curiae regarding content discrimination.

[11]California Penal Code 118.1 provides:

> Every peace officer who files any report with the agency which employs him or her regarding the commission of any crime or any investigation of any crime, if he or she knowingly and intentionally makes any statement regarding any material matter in the report which the officer knows to be false, whether or not the statement is certified or otherwise expressly reported as true, is

*sis*, 93 Cal. App. 4th 1429, 1449 n.2 (2001). We are aware of no authority, nor do the parties direct us to any, holding that a knowingly false statement made by an officer in the course of a misconduct investigation falls within the prohibition of filing a false crime report under section 118.1. Similarly, sections 132 and 134 only prohibit the preparation and offering of forged or fraudulently altered *documents*. *See* Cal. Penal Code §§ 132,[12] 134;[13] *see also People v. Pereira*, 207 Cal. App. 3d 1057, 1068 (1989) ("[Section 134] applies to the *preparation* of a false or antedated *document* with the intent to produce it or allow it to be produced for any fraudulent purpose. [Section 132] applies to the actual *offer in evidence* of a false or fraudulently altered or antedated *document*." (emphasis of "document" added)).

We note that any impermissible viewpoint-based bias present in the complaint investigation process is easily cured: California can make all parties to an investigation of peace officer misconduct subject to sanction for knowingly making false statements. Otherwise, the selective sanction imposed by section 148.6 is impermissibly viewpoint-based.

___

guilty of filing a false report punishable by imprisonment in the county jail for up to one year, or in the state prison for one, two, or three years. This section shall not apply to the contents of any statement which the peace officer attributes in the report to any other person.

[12]Penal Code § 132 provides:

Every person who upon any trial, proceeding, inquiry, or investigation whatever, authorized or permitted by law, offers in evidence, as genuine or true, any book, paper, document, record, or other instrument in writing, knowing the same to have been forged or fraudulently altered or ante-dated, is guilty of felony.

[13]California Penal Code § 134 provides:

Every person guilty of preparing any false or ante-dated book, paper, record, instrument in writing, or other matter or thing, with intent to produce it, or allow it to be produced for any fraudulent or deceitful purpose, as genuine or true, upon any trial, proceeding, or inquiry whatever, authorized by law, is guilty of felony.

## CONCLUSION

**[13]** Because Chaker's conviction was obtained under a statute that runs afoul of the First Amendment, we reverse the judgment of the district court, grant Chaker's petition for habeas corpus, and remand for issuance of the writ.

REVERSED AND REMANDED.