**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CANDACE L. FOX, *Petitioner-Appellant*, | No. 13-56704 |
| v. | D.C. No. 2:04-cv-06933-AG-SS |
| DEBORAH K. JOHNSON, *Respondent-Appellee.* | OPINION |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued March 5, 2015
Submitted August 1, 2016
Pasadena, California

Filed August 8, 2016

Before: Stephen Reinhardt, N. Randy Smith,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge N.R. Smith;
Concurrence by Judge Hurwitz;
Dissent by Judge Reinhardt

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's denial of a California state prisoner's habeas corpus petition challenging her conviction for first-degree murder and first-degree burglary.

The petitioner pleaded guilty to second-degree murder and, pursuant to a plea agreement, was sentenced to fifteen years to life imprisonment. She later successfully petitioned to withdraw her guilty plea after establishing that the sentencing court failed to inform her that she would receive a mandatory term of lifetime parole as a direct consequence of her plea. At her subsequent trial, she was convicted of first-degree murder and first-degree burglary and was sentenced to life imprisonment without the possibility of parole.

In her federal habeas petition, the petitioner sought specific performance of an alleged plea agreement in which the state promised her a term of imprisonment no greater than seven and one-half years in exchange of her plea. The panel held that because the petitioner chose in the state habeas proceedings to seek vacation of her conviction, rather than specific performance of the purported plea agreement, she had no due process right to specific performance of the rescinded agreement.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Hurwitz wrote that the case was troubling and that, having had a hand in producing an outcome that disfavored the one defendant who cooperated with the prosecution, the state could remedy the situation either through clemency or by once again offering the petitioner the chance to plead guilty to second-degree murder.

Dissenting, Judge Reinhardt wrote that the proceeding was fundamentally unfair, and due process required specific performance of the plea agreement and vacation of the petitioner's unconstitutional sentence of life without the possibility of parole.

## COUNSEL

Michael Parente (argued), Assistant Federal Public Defender; Sean K. Kennedy, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

David Wildman (argued) and Jason Tran, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

Candace Lee Fox pleaded guilty to second-degree murder in 1984 in California Superior Court and, pursuant to a plea agreement, was sentenced to a term of imprisonment of fifteen years to life. Approximately five years later, Fox successfully petitioned to withdraw her guilty plea after establishing that the sentencing court failed to inform her that she would receive a mandatory term of lifetime parole as a direct consequence of her plea. At her subsequent trial, Fox was convicted of first-degree murder, first-degree burglary, and the special circumstance that the murder was committed in the course of a burglary. She was sentenced to life imprisonment without the possibility of parole. In this 28 U.S.C. § 2254 habeas proceeding, Fox now argues that the State originally promised her a term of imprisonment no greater than seven and one-half years in exchange for her plea, and asks for specific performance of that purported agreement.

We refuse Fox's request and affirm the district court, because Fox chose in the state habeas proceedings to seek vacation of her conviction, rather than specific performance of the purported plea agreement. She therefore has no due process right to specific performance of the rescinded agreement.

## FACTUAL BACKGROUND

In June 1984, Fox, Janet Meyer, Scott Peters, and Eddie Rangel drove to Lewis Levy's apartment to collect $100 that Levy allegedly owed Meyer for sexual services. Meyer told

the others that Levy had $20,000 to $30,000 in travelers checks in his apartment. The group forced their way into the apartment and held Levy at gunpoint while they searched for cash and travelers checks. After they found Levy's wallet and $20,000 in travelers checks, Meyer and Rangel departed to purchase cocaine, leaving Fox and Peters with Levy.

Levy took this opportunity to run for the door. Peters struck Levy over the head with the barrel of his revolver until the handle broke. Peters then attempted to shoot Levy, but his gun jammed. Fox handed Peters a large steak knife from Levy's kitchen. Peters attempted to stab Levy twice, but the blade bent and did not penetrate. At that point, Levy fell to the ground nearly unconscious. When Meyer and Rangel returned with the cocaine, Levy remained semiconscious on the ground. After Rangel left, Peters explained to Meyer that Levy had tried to escape.

After Fox, Peters, and Meyer used the cocaine, Meyer stated that she was not leaving the apartment until Levy was dead. Meyer took a Swiss Army knife from her pocket and repeatedly stabbed Levy. Fox struck Levy over the head with a beer bottle, and Peters attempted to strangle Levy with a phone cord. Nonetheless, Levy was still alive. Peters then left the apartment and waited in Fox's car. Twenty minutes later, Fox and Meyer left the house with two shopping bags containing the gun and knives used in the attack. They told Peters that Levy was dead.

The next day, the group cashed several of Levy's travelers checks and purchased drugs. The following morning, Meyer's roommate called the police after overhearing an argument between Meyer and Fox about the murder. The police questioned Meyer, who disclosed the location of Levy's

body. After further investigation, the police arrested Fox, Meyer, and Peters.

## PROCEDURAL BACKGROUND

### A.  Fox's Guilty Plea and Sentence

Fox, Meyer, and Peters were charged with first-degree murder, first-degree burglary and robbery, and the special circumstances of (a) murder during the commission of a robbery and burglary and (b) use of a deadly weapon in the murder, making them eligible for the death penalty. Fox agreed to plead guilty to second-degree murder[1] in exchange for testifying against Peters.[2]

The plea agreement was not reduced to writing. Fox argues that she was promised she "would be paroled after serving 7.5 years with good behavior." The State contends that Fox was promised she would be sentenced to fifteen years to life in prison, but would be eligible for parole consideration after seven and one-half years. Fox's change of plea hearing on November 6, 1984, supports the State's contention:

> PROSECUTOR: By way of sentence . . . you're going to receive—as we discussed,

---

[1] When Fox pleaded guilty, second-degree murder in California was subject to a mandatory minimum of fifteen years to life. Cal. Penal Code § 190(a).

[2] On November 9, 1984, Fox testified for nearly five hours at Peters's preliminary hearing. Peters later pleaded guilty to second-degree murder. Meyer also pleaded guilty to second-degree murder.

you're going to receive 15 years to life on this case. Do you understand that?

FOX: Yes.

PROSECUTOR: That is the sentence for second degree murder. There are no enhancements. It's a straight second degree and you're going to receive a sentence from [the court] of 15 years to life.

FOX: Yes.

PROSECUTOR: And do you understand that it's up to you how much time you will do. It's indeterminate. We can make no promises or representations on what the Board of Prison Terms will or will not do or when they will release you. There is a life-time top. Do you understand that?

FOX: Yes.

After being so advised, Fox pleaded guilty. The court accepted her plea as knowing and voluntary. There is thus no contest that Fox agreed to a sentence of fifteen years to life. But, Fox was not advised during the plea colloquy that she also faced a lifetime term of parole when released.

At the sentencing hearing, Fox's counsel asked for a continuance to amend the probation report. The court responded: "I don't understand exactly what you're doing here, Mr. Ficht. She is going to receive a sentence of fifteen to life, is that correct? Fifteen to life, and that's going to be

her sentence." In response, Ficht stated that Fox's probation report was "the most outrageous document I've seen." The court told Ficht to "file an amendment. She's going to be there for quite awhile. I don't understand what the difference is. She should get going. She's losing time." Any parole consideration was only discussed during the following exchange:

> FICHT: Also, if I may, for the record, Your Honor, I believe the People have indicated as part of the plea bargain that [Fox would] be looking at obtaining probation—parole, excuse me, in seven and a half years. Is that correct, [prosecutor]?

> PROSECUTOR: That's correct.

> TRIAL COURT: All right. Understand that?

Fox now argues that this exchange "modified the plea agreement" to require that she be paroled after seven and one-half years in prison. However, neither the parties nor the court acknowledged any modification of the plea agreement at the hearing. Following the exchange between Ficht and the prosecutor, the court sentenced Fox to fifteen years to life in state prison without any reference to parole eligibility or release on parole, stating: "All right. Miss Fox, the court has read and considered the probation report. Probation is denied. You are sentenced to the state prison for the term prescribed by law, which in this case is fifteen years to life." Fox did not object.

## B. Post-Conviction Proceedings

On July 1, 1986, Fox filed her first petition for a writ of habeas corpus in state Superior Court. Rather than seeking specific performance of the alleged plea agreement, Fox instead sought to withdraw her plea of guilty on two grounds.

First, Fox alleged that, when she entered her plea, she "did not understand that her term could exceed seven and one-half years even if her prison behavior were good." Instead, Fox claimed that she believed that she was "*entitled* to release after seven and one-half years, provided that she behaved properly in state prison." Fox acknowledged that such a belief was contrary to California law, because a petitioner "is not *entitled* to release after serving the minimum period of incarceration." Fox also acknowledged that "no firm promise . . . was given [to her] before her actual sentencing" as to eligibility for parole in seven and one-half years. However, Fox maintained (citing the portion of the sentencing proceedings excerpted above) that the "the parties understood that if [Fox] was cooperative and fully truthful in her testimony, she would be eligible for parole after 7 1/2 years . . . and in fact would receive parole if she behaved herself in state prison." Fox also argued that, before entering her plea, she "was not advised of the mandatory post-incarceration parole term." Fox asserted that, had "she known the full consequences of her guilty plea, she would not have pled guilty."

Second, Fox asserted that she had received ineffective assistance of counsel during the plea process and that she was

"not in fact guilty of second degree murder."[3] Fox argued that her previous attorney "erroneously" told her that, if she went to trial, she could not use a defense of duress; her new counsel, on the other hand, assured her that she "had a good defense of duress." Fox argued that her former attorney failed to "comprehend and/or advise her of the defenses available" and that she entered her plea after "rel[ying] upon [such] erroneous legal advice." The Superior Court denied this first habeas petition, citing the guilty plea transcript.

On August 26, 1986, Fox filed a second petition in the Court of Appeal, alleging "that her sentencing was unlawful and the matter should be remanded for resentencing." In this petition, Fox repeatedly insisted that she sought "withdrawal [of] her plea of guilty," making the same arguments as those in her Superior Court petition. On September 4, 1986, the Court of Appeal denied the petition as not ripe, because Fox had not yet served seven and one-half years in prison.

On January 24, 1989, after serving just over four and one-half years in prison, Fox filed a third habeas petition in the state Superior Court. The arguments echoed those in her previous petitions. Fox asked to withdraw her guilty plea, asserting that it was not voluntary and that her counsel was ineffective. Fox also argued that (1) newly discovered evidence exonerated her of the murder;[4] (2) defense counsel

---

[3] The dissent states that Fox "never seriously denied her guilt." Dissent 60. However, Fox specifically claimed in her first habeas petition that "she [was] not in fact guilty of [the] offense and was unaware of [the defense of duress] at the time she entered her plea."

[4] Fox also alleged that she received letters from Peters, in which he took full responsibility for the murder.

failed to throughly investigate and advise her regarding a viable duress defense; (3) she was not advised of a mandatory parole term after incarceration and "would not have entered a guilty plea if she had known of this lifetime parole"; and (4) she did not understand that her period of confinement would exceed seven and one-half years with good prison behavior. Importantly, this petition again did not seek specific performance of the alleged plea agreement. On October 13, 1989, the Superior Court granted the habeas petition, setting aside Fox's conviction and granting her a new trial on the basis that she had not been informed before entering the plea that she faced lifetime parole. The court did not address Fox's other arguments.

On November 26, 1990, shortly before the new trial was to begin, Fox filed a motion seeking, for the first time, to enforce the previous plea agreement as she understood it—that is, assuring release after seven and one-half years—or, in the alternative, preventing the State from seeking more than a second-degree murder conviction at trial. The State argued that, because Fox had successfully withdrawn her plea of guilty, there was no plea agreement to enforce. The Superior Court denied "specific performance of the original case settlement."

Fox was tried on the original charges of first-degree murder, first-degree burglary, and the special circumstance that the murder was committed in the course of a burglary. On January 28, 1992, the jury returned guilty verdicts on all charges. On May 13, 1992, Fox again requested that the court order specific performance of her prior plea bargain, arguing she was entitled to eligibility for parole in seven and one-half years. On May 29, 1992, the court denied the motion and

sentenced Fox to life imprisonment without the possibility of parole.

Fox appealed, asserting, among other things, that "the trial court erred in denying appellant's motions for specific performance of her plea bargain," citing *Santobello v. New York*, 404 U.S. 257 (1971), for the proposition that specific performance is a remedy for breach of a plea agreement.[5] On March 30, 1994, the California Court of Appeal affirmed Fox's conviction. The court concluded that Fox was not entitled to specific performance of her plea bargain, stating that:

---

[5] The dissent states that the State changed its position at this point and "admitted for the first time that, pursuant to the plea agreement, Fox was to serve 'about 7 1/2 years.'" Dissent 36. We disagree with this characterization of the State's argument.

From the beginning, the State has maintained that the parties bargained for a sentence of fifteen years to life for second-degree murder. The State has conceded that, pursuant to the plea agreement, Fox would be *eligible* for parole after seven and one-half years, though the only evidence in the record of such a promise was the exchange between Fox's counsel and the prosecutor at the sentencing hearing. The State has also argued that, notwithstanding such a promise, the minimum parole eligibility under California case law for Fox's sentence was ten years, and thus a promise of eligibility before that time would have been unenforceable.

Before the California Court of Appeal, the State argued that the plea agreement was no longer enforceable because Fox had withdrawn her plea. The statement in the State's brief that, "pursuant to the plea agreement, [Fox] would serve about 7 1/2 years" was not, as the dissent puts it, evidence that the State had previously lied, but rather a shorthand version of the plea agreement between the parties. The California Court of Appeal then based its decision on the State's statement in its brief.

When Fox pled guilty in 1984, she got what she bargained for, a sentence of 15 years to life, with a promise of parole in seven and one-half years. Five years into her sentence (with only two and one-half years to go), Fox decided she didn't like the deal she'd made, petitioned for a writ of habeas corpus and succeeded in having her plea set aside, on the ground she had not been fully advised of the consequences of her guilty plea (her alternative ground of duress was rejected). She clearly felt very strongly that the obligation of a lifetime on parole was not something she could accept . . . . She got exactly what she asked for—her plea was set aside and the People were required to prove the charges against her.[6]

---

[6] The Court of Appeal acknowledged "the inevitability of a habeas petition attacking the competency of the attorney who filed the petition to set aside Fox's guilty plea." However, it noted that such a claim would necessarily require "an evidentiary hearing to determine what Fox's attorneys told her at the time the decision was made to attack the guilty plea [given that she had already served over four years of her sentence]." Thus, such a "petition should be addressed to the trial court, not to us."

The Court of Appeal concluded that Fox received "a sentence of 15 years to life, with a promise of parole in seven and one-half years," and thus "got what she bargained for." However, as Fox acknowledged in her first habeas petition, she was not entitled to parole after seven and one-half years under her original sentence. This error is not consequential, because the Court of Appeal's ultimate conclusion—that Fox "got exactly what she asked for" when her habeas petition was granted and the original conviction set aside—is correct.

Fox then filed a petition for review in the California Supreme
Court, which was summarily denied on June 30, 1994.

On April 22, 1997, Fox filed a new habeas petition in the
Superior Court, which was denied on May 14, 1997. Fox filed
another habeas petition in the Court of Appeal on April 23,
1998. On July 24, 1998, that court remanded for an
evidentiary hearing on whether Fox received ineffective
assistance of counsel in connection with the habeas petition
that resulted in her guilty plea being withdrawn. The Superior
Court "cabined" its inquiry to the question of whether counsel
had advised Fox that, if she successfully withdrew her plea,
she could face a new trial and a longer sentence, including a
potential life sentence without the possibility of parole.
During the two-day hearing, Fox's habeas counsel, Rowan
Klein, testified that he had advised Fox that, if her habeas
petition were granted, she would go back to square one and
face the possibility of a sentence of life without parole. When
asked if he considered seeking specific enforcement of the
original plea bargain prior to seeking to withdraw the plea,
Klein responded,

> I'm sure I did but . . . [the reference to
> obtaining parole in seven and a half years
> wasn't] a plea bargain because it's an attorney
> uttering incompetent words at the time of
> sentencing. It's not something that is legally
> binding on The Court or the District Attorney,
> unfortunately. I mean, you can try and turn it
> into that through alliance and whatever, but,
> legally, it probably isn't the strongest
> argument. And that's why I sought relief on
> the stronger argument, which was the failure
> to advise her of the parole consequences. . . .

> My assessment was that the comments of Bruce Ficht [Fox's counsel at sentencing] are . . . an indication that he didn't know what he was taking about . . . with respect to the meaning of a 15-to-life sentence. To me, a plea bargain is when the parties may have a discussion at the time of the plea, not when an attorney makes a gratuitous comment at the time of sentencing.

The Superior Court denied Fox's petition, finding that she had been advised prior to the 1989 grant of habeas "of all the possible ramifications that were legally available, including—and it may even have been the death penalty—but certainly the option of life without the possibility of parole; that she'd go back to square one."

On February 9, 2001, Fox filed a new habeas petition in the California Court of Appeal, which was denied without explanation or citation to authority on August 15, 2001. On November 24, 2003, Fox filed a habeas petition in the California Supreme Court, which was denied on July 14, 2004, in an order stating: "Petition for writ of habeas corpus is DENIED. (*See In re Robbins* (1998) 18 Cal.4th 770, 780.)."

Fox filed a pro se 28 U.S.C. § 2254 habeas petition in the district court on August 13, 2004, claiming that the state courts denied her due process rights by failing to specifically enforce her 1984 plea agreement. A magistrate judge ultimately recommended denying the petition, noting that Fox had "successfully moved to withdraw her guilty plea before she was eligible for release on parole; therefore, the State could not have actually breached the parole agreement in the manner petitioner claims." The district court adopted the

report and recommendation, denied the petition, and issued a certificate of appealability on the question of the specific performance of Fox's 1984 plea agreement. This appeal timely followed.

## STANDARD OF REVIEW

The district court's denial of a petition for a writ of habeas corpus is reviewed de novo. *Jones v. Taylor*, 763 F.3d 1242, 1245 (9th Cir. 2014). "[A] federal district court's findings and its adoption of the findings of a federal magistrate judge are reviewed under the clearly erroneous standard." *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994).

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may not grant a habeas petition filed by a person in state custody:

> with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). However, where "no state court has adjudicated [the] claim on the merits, and the state has established no procedural bar to its consideration, the

strictures of 28 U.S.C. § 2254(d) do not apply, and our review is *de novo*." *Riley v. McDaniel*, 786 F.3d 719, 723 (9th Cir. 2015); *see also Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005) (applying de novo standard of review to a claim in a habeas petition that was not adjudicated on the merits by the state court); *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (same).

AEDPA applies "to a single state court decision, not to some amalgamation of multiple state court decisions." *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005). "When more than one state court has adjudicated a claim, we analyze the last reasoned decision." *Id.* at 1091 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991)). Under *Ylst*, we only look through the last state court decision to a prior decision on the merits if the last decision is unreasoned, that is, if the decision "does not disclose the reason for the judgment." 501 U.S. at 802; *see also Castellanos v. Small*, 766 F.3d 1137, 1145 (9th Cir. 2014) ("[A] state supreme court's summary denial of discretionary review, which generally does not state a reason for that denial, is not a 'reasoned' decision under AEDPA, and we must 'look through' that unexplained decision to the last court to have provided a 'reasoned' decision.").

The last "reasoned" decision here was the California Supreme Court's 2004 order denying Fox's habeas petition with a citation to *In re Robbins*, 18 Cal. 4th 770, 780 (1998). However, the citation to *Robbins* indicated that the decision rested on the untimeliness of Fox's petition, not on the merits of her constitutional claims. *See Walker v. Martin*, 562 U.S. 307, 313 (2011) ("A summary denial citing . . . *Robbins* means that the petition is rejected as untimely."). The State has now waived the affirmative defense of procedural default

that formed the basis of the 2004 California Supreme Court's reasoned decision. The last reasoned decision on the merits of Fox's current claims is the affirmance of her conviction on direct appeal by the California Court of Appeal in 1994.

The State urges that we apply AEDPA deference to the 1994 Court of Appeal decision. But, we need not decide that issue. We may "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). We conclude that, even under de novo review, Fox cannot prevail.

## DISCUSSION

Fox claims she has a due process right to specific performance of her original plea deal, in which she alleges the State promised to release her from prison after seven and one-half years. For purposes of our analysis, we assume (without deciding) that the State promised Fox release after seven and one-half years and that the State breached that promise. Nevertheless, Fox is not entitled to specific performance of her plea agreement, because she voluntarily chose to withdraw her guilty plea, thereby voiding her plea agreement. There is thus no plea agreement to enforce. Under these circumstances, there is no precedent suggesting that Fox was denied due process by denying her specific performance.

As the Court of Appeal observed, Fox's successful habeas petition sought only to withdraw her guilty plea as not knowing and voluntary, rather than to enforce a plea agreement. At no point in the habeas proceedings, which

culminated in the state court's order allowing Fox to withdraw her plea, did Fox seek to enforce the plea agreement; rather, she sought to set it—and the accompanying guilty plea—aside. Although Fox argued that she was serving a longer sentence than she expected, she advanced that argument solely to show that she was not advised of the extent of the sentence she would serve if she pleaded guilty. She simultaneously argued both her actual innocence and that the plea was invalid because she was never informed of the possibility of a parole term following release. The record indicates that Fox sought to withdraw her plea so that she could assert defenses to the charges against her. Indeed, Fox's habeas counsel testified he made a strategic decision not to seek to enforce the alleged plea agreement. Fox did not attempt, until the eve of her trial, to hold the State to the deal she believed it made with her.

Fox's current petition rests on the theory that a criminal defendant has a due process right to bind the government to a plea agreement even after choosing to withdraw the plea rather than seek specific performance of the plea agreement. Fox identifies no precedent recognizing that right, nor have we found any. Indeed, the weight of persuasive precedent cuts the other way. We have instead explained that "[w]hen the district court exercises its power under the Federal Rules to reject a plea agreement or permit a defendant to withdraw his plea, it is clear by implication that the parties are consequently released from their obligations under the plea agreement." *United States v. Partida-Parra*, 859 F.2d 629, 634 n.6 (9th Cir. 1988). Moreover, a defendant who "chose of his own accord to challenge an aspect of the proceedings against him, . . . [takes] a calculated risk of" having the original charges reinstated. *Taylor v. Kincheloe*, 920 F.2d 599, 603–04 (9th Cir. 1990). The Sixth Circuit has come to

the same conclusion, holding that when a defendant succeeds in withdrawing a guilty plea entered pursuant to a plea agreement, the plea agreement is "nullified" and "the government [is] no longer bound by its promises therein." *United States v. Jones*, 469 F.3d 563, 566 (6th Cir. 2006). In the course of discussing prosecutorial vindictiveness, the Fifth Circuit noted "[we] see no distinction between a defendant's refusal to plead guilty and a defendant's successful withdrawal of a guilty plea . . . . In both circumstances the defendant has, in essence, refused the Government's offer of a plea and exercised his right to force the Government to prove its case." *United States v. Saltzman*, 537 F.3d 353, 361 (5th Cir. 2008). Fox rescinded her plea agreement; there was nothing left to enforce.[7]

Fox urges us to apply state contract law. *See United States v. Barron*, 172 F.3d 1153, 1158 (9th Cir. 1999) (en banc) ("[W]e have frequently analyzed plea bargains on contract principles."). However, doing so does not aid her. Under California law, "[r]escission extinguishes a contract, rendering it void *ab initio*, as if it never existed." *DuBeck v. Cal. Physicians' Serv.*, 184 Cal. Rptr. 3d 743, 750 (Ct. App. 2015). By obtaining a writ of habeas corpus nullifying her plea as not knowing and voluntary, Fox also nullified her plea agreement. Whatever terms were in that agreement are no longer operative.[8]

---

[7] Fox does not claim prosecutorial vindictiveness in this habeas proceeding.

[8] There are limits to the analogy to contract law: "A plea bargain is not a commercial exchange. . . . On rescission of the agreement, the prisoner can never be returned to his 'original position': he has served time by reason of his guilty plea and his surrender of basic constitutional rights." *Barron*, 172 F.3d at 1158. In that case, which involved a 28 U.S.C. § 2255

In *Santobello v. New York*, the Supreme Court held that the remedies for a breach of a plea agreement were either specific performance of the agreement or rescission of the entire agreement and withdrawal of the guilty plea, to be determined by the state court based on what "the circumstances of [the] case require." 404 U.S. 257, 263 (1971). Where rescission is unable to repair the harm done by the government's breach, and where the defendant has upheld her end of the bargain, we have held that "specific performance [is] the only viable remedy." *Brown v. Poole*, 337 F.3d 1155, 1161 (9th Cir. 2003). Indeed, we have mandated specific performance as a remedy even where the sentence the prosecutor promised to a defendant was not a sentence allowed for under state law. *Buckley v. Terhune*, 441 F.3d 688, 699 (9th Cir. 2006) (en banc).

But, here, rather than seek specific performance, Fox chose to withdraw her guilty plea, voiding the plea agreement. She sought one of the remedies under *Santobello*, and received it.[9] Even if she had sought specific performance,

---

petition, this court sitting en banc refused to require a retrial, that is to completely void the guilty plea, when one of the counts of conviction later turned out to be unlawful. *Id.* at 1161. However, *Barron* turned on an interpretation of the scope of the relief available under § 2255. *Id.* at 1159. Fox seeks relief under § 2254. Thus, we are called on to determine what due process requires, not what relief Fox might be afforded were she a federal prisoner.

[9] Our recent decision in *Cuero v. Cate*, —F.3—, 2016 WL 3563660 (9th Cir. 2016), is not to the contrary. In *Cuero*, the defendant had pleaded guilty pursuant to a written plea agreement. The day before sentencing, the State moved to amend the complaint in a manner that would substantially increase the defendant's sentence. The Superior Court granted the motion and allowed the defendant to withdraw his guilty plea. The defendant argued in his subsequent habeas petition that the State had breached the

*Santobello* "leave[s] to the discretion of the state court" whether the circumstances of the case require specific performance or an opportunity to withdraw the plea. 404 U.S. at 263. No binding Supreme Court decision finds a constitutional violation when a state court chooses the remedy a petitioner expressly chose or when she maintains her innocence of the original charges. Nor does any decision of which we are aware find that a state court abuses its discretion by declining to enforce a plea agreement which would impose a term of parole to which the defendant claims she was never made aware and to which she steadfastly objects.

Fox now asserts that rescission of the plea agreement (1) was forced by the State's breach and (2) she never waived her right to assert a breach of the plea agreement. We have found no authority, and Fox cites none, to support her first

---

plea agreement and sought specific performance. The panel granted the petition, finding that permitting the defendant to withdraw his guilty plea was not an adequate remedy and that the Superior Court unreasonably failed to apply principles of California contract law to the plea agreement.

Unlike the defendant in *Cuero*, Fox opted not to seek specific performance in her first habeas petition. Therefore, the Superior Court here did not fail to reasonably apply the principles of California contract law when it granted Fox the very remedy she requested.

The dissent disagrees with our characterization of *Cuero*, stating that "[h]ere, as in *Cuero*, the state breached its agreement, and here, as in *Cuero*, the breach resulted in the withdrawal of the plea agreement." Dissent 59. This is incorrect. Nowhere in Fox's first habeas petition did she seek specific performance or argue that the government had breached the agreement. Instead, from the outset, Fox sought to *withdraw* her plea, arguing that "she did not understand" the terms of the agreement and that her lawyer had provided ineffective assistance. In short, Fox got exactly what she requested. Cuero did not.

contention. In any event, the State did not coerce Fox to seek to withdraw her plea, rather than seek to enforce the alleged agreement. Rather, the State steadfastly maintained that Fox was entitled to no relief at all. At the time Fox sought state habeas relief, *Santobello* was the law of the land. Nothing prevented Fox, acting with the assistance of counsel, from seeking specific performance. Yet, she chose not to do so; her counsel, whose effectiveness is not today at issue, testified that he considered but rejected that option.

Fox maintains that, even after withdrawing her plea, she had a due process right to assert a breach of the plea agreement, and this right was never waived. We agree that Fox had a constitutional right to enforce the plea agreement, *see Doe v. Harris*, 640 F.3d 972, 975 (9th Cir. 2011) (en banc), and that a waiver of a constitutional right must be knowing and voluntary, *see Schell v. Witek*, 218 F.3d 1017, 1023 (9th Cir. 2000). But "even constitutional rights can be waived if not timely asserted." *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 758 (9th Cir. 1999). If there were a time for Fox to assert a breach of her plea agreement, it was before the guilty plea was withdrawn and the agreement was rescinded.

By the time Fox sought specific performance, the plea agreement had been rescinded. We confronted similar circumstances in *United States v. Burdeau*, 168 F.3d 352 (9th Cir. 1999). In *Burdeau*, the defendant entered into a plea agreement that specified he was to receive a maximum of ten years' imprisonment on a robbery count and would have a gun charge dismissed. *Id.* at 355. The defendant later withdrew his plea and asserted a new defense to the charges. *Id.* After the district court ruled that the defense was unavailable, the defendant sought to reinstate his original plea

deal. *Id.* The State refused, and we held that the district court was not required to reinstate the plea. *Id.* at 358. *Burdeau* stands for the proposition that, once a plea agreement is rescinded, the State need not reoffer the same terms, and the trial court is not required to enforce the agreement's now-defunct provisions.

We agree with our dissenting colleague that the circumstances of this case are unfortunate. The others convicted of the offense for which Fox is serving a life sentenced received lesser terms, and she kept her promise of cooperation to the State. Indeed, she would have been better off had the state court never granted her habeas petition; she would at least now be eligible for parole. But she chose to rescind a plea agreement that treated her as well as her co-defendants, despite her counsel's advice that this could return her to ground zero. No Supreme Court authority or other precedent establishes that the Due Process Clause requires the enforcement of a plea agreement under these circumstances. Accordingly, the district court did not err in denying Fox's § 2254 petition.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring:

Candace Fox committed a gruesome and senseless crime. She was ultimately convicted of first-degree murder, and does not argue in this § 2254 proceeding that she did not receive a fair trial.

Nonetheless, as both Judge Smith and Judge Reinhardt note, this is a troubling case. Fox originally pleaded guilty to second-degree murder in exchange for her testimony against a co-defendant. She held up her end of the bargain, testifying for five hours in a preliminary hearing. Yet both that co-defendant and another received lesser sentences than the one Fox is now serving. Moreover, the record of the plea bargaining process is, to put it charitably, a mess. At one point the record suggests that Fox was promised release from prison after seven and one-half years, and at another reflects that Fox was clearly advised that her sentence was indeterminate, and that the parole board would ultimately decide when she would be released.

But, all this became moot when the superior court granted Fox's habeas petition, setting aside her guilty plea and conviction. That is the remedy she repeatedly sought. Indeed, her habeas counsel testified that he thought about seeking specific performance of the purported plea agreement, but decided against it. That decision was motivated by the lack of clarity about precisely what the purported deal was; although we have assumed today that the State promised Fox release after seven and one-half years with good behavior, the record does not clearly establish that the agreement entitled Fox to release, rather than only parole consideration.

Fox does not today urge that she received ineffective assistance of counsel in the state habeas proceedings, and the state courts have found that she did not. Indeed, the record suggests that, when she sought habeas relief, Fox was unwilling to accept the original bargain. She claimed that she never would have pleaded guilty had she known of the required term of lifetime parole upon release, and asserted

actual innocence. The State might well have chosen in the interests of justice to proceed only with second-degree murder charges against Fox on retrial. But, as Judge Smith explains, its decision not to do so was not unconstitutional. Still, having had a hand in producing an outcome that disfavored the one defendant who cooperated with the prosecution, the State could remedy this situation either through clemency or by once again offering Fox the chance to plead guilty to second-degree murder. But, we cannot order such relief; our role in this matter is constrained.[1] In a § 2254 habeas petition, we are limited to determining whether the Constitution was violated. Judge Smith clearly explains why it was not, and I concur in his opinion in full.

---

REINHARDT, Circuit Judge, dissenting:

Candace Fox's crime was not a pretty one. Yet, in 1984, California made her a promise in exchange for her promise of consideration it badly wanted from her. It promised her that, if she testified against her co-defendant and pleaded guilty to second degree murder, she would be paroled, assuming good behavior, in seven and one-half years. If the State had kept its word, Fox would have been released from prison over two decades ago. Instead, because the State brazenly broke its

---

[1] Judge Reinhardt's dissent is premised on the notion that, although Fox chose to vacate her plea agreement rather than to specifically enforce it, the state court violated the Due Process Clause by giving her exactly what she sought. But neither *Cuero v. Cate*, — F.3d —, 2016 WL 3563660 (9th Cir. 2016), nor any other case Judge Reinhardt cites so holds. Absent ineffective assistance, a defendant whose plea agreement is breached is not limited to the remedy of specific performance; she may seek to vacate the plea and go to trial. That is the unfortunate choice Fox made here.

promise to her and lied about it to the courts, Fox will now likely spend the rest of her life in prison, unless the governor commutes her sentence.

Thirty years ago, in 1986, when Fox filed her first habeas petition, this case should have had a simple resolution. There would be no petition before us today if the State had simply assured Fox that she would receive the term of imprisonment that she and the State had agreed to when she forfeited her freedom, or if the State courts that heard Fox's 1986 petitions had fulfilled their obligation, under *Santobello v. New York*, 404 U.S. 257 (1971), to determine the appropriate remedy for the State's breach of its plea agreement. Instead, the state prosecutors repeatedly denied promising Fox even the possibility of a release in seven and one-half years, despite the clear evidence to the contrary. The state courts for their part entirely disregarded her petitions, although the state court of appeal later found that she had been promised the parole to which she had repeatedly told them she was entitled. Frustrated with the struggle, Fox sought to withdraw from the terms of the "agreement" that the State unilaterally imposed upon her. Instead, although she had already fulfilled her part of the bargain, the court withdrew her entire plea agreement, and after serving almost her full seven and one-half year prison term, Fox found herself involuntarily facing trial anew—this time on an even more serious charge, one that the State had promised not to bring.

In the thirty-odd years since Fox first sought to hold the State to its bargain, she has been failed by many people: the state prosecutors who abused her trust, the state judges who failed in their obligation to provide her with an appropriate remedy for the State's broken promise, and the attorney who sought to "withdraw" her plea rather than seek the remedy

she had desired from the beginning—specific performance of her bargain. The majority, while purporting to recognize that this is an "unfortunate" situation, concludes that it cannot provide Fox with a remedy due to the procedural posture of this case. While it comes as no surprise that my colleagues honestly believe that our habeas jurisprudence's rigid adherence to procedural rules demands a result so antithetical to justice, I cannot in good conscience concur. In my opinion, due process, at its core, requires that every judicial proceeding be fundamentally fair, *see Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 24–25 (1981)—and what happened to Candace Fox is not fair, not by any possible conception of the word. If due process means anything, it means that the promise that the State made over thirty years ago should be enforced and Fox's unconstitutional sentence of life without the possibility of parole should be vacated. Fox has more than served her time. I respectfully dissent.

## I. BACKGROUND

The story of this case is one of repeated falsehoods by the state prosecutors and repeated errors by the state courts, each condemning Fox to untold years in prison in violation of the State's original bargain. While the majority opinion describes the procedural posture of this case at great length in order to explain why it believes there is nothing it can do for Fox—or for justice—its cold recitation of the facts does not adequately capture the injustice that has occurred. Nor can the majority opinion or any other obfuscate the plain fact that after Fox carried out her part of the bargain, the State obdurately and willfully refused to carry out its.

In 1984, Candace Fox struck a plea agreement with California prosecutors. The agreement was not reduced to

writing but its terms were clear. Fox would plead guilty to second-degree murder and testify against her co-defendant. In exchange, the State would drop all additional charges against her. Under this plea, the State promised, she would be sentenced to 15 years to life, and would be paroled at the end of seven and one-half years of imprisonment if she conducted herself properly while incarcerated. Although the State for many years denied ever making Fox any such promise, the transcript of her sentencing hearing reveals the truth, and the state court of appeal ultimately recognized that it did. As the transcript shows, after the sentencing judge announced Fox's sentence of fifteen years to life, defense counsel objected, and the following exchange occurred:

> [Counsel]: [I]f I may, for the record, Your Honor, I believe the People have indicated as part of the plea bargain that [petitioner would] be looking at obtaining probation–parole, excuse me, in seven and a half years [¶] Is that correct, [prosecutor]?

> [Prosecutor]: That's correct.

> [Trial Court]: All right . . . Also, the court will order a transcript of these proceedings to be sent with [petitioner] to the state prison just in an abundance of caution.

Fox fulfilled her end of the bargain. She testified at the preliminary hearing against her co-defendant for over five

hours. Subsequently, she pleaded guilty to second-degree murder and commenced serving her sentence. In the course of doing so, she learned that the state prosecutor had made a false promise—a promise the State ultimately asserted that it could not fulfill. A representative of the parole board informed Fox that under California law she would not be eligible for parole until she had spent at least ten years in prison. Further, she learned that after her release she would be on parole for the rest of her life. Understandably dismayed to discover that the State had misrepresented the truth to her, Fox began her thirty year struggle to hold the State to its word—as it turned out, a hopeless Sisyphean task.

## A. 1986 Habeas Petitions

In 1986, Fox filed her first habeas petition in the Los Angeles Superior Court seeking to ensure that the State would fulfill its end of the bargain. In it, she explained that, at the time she entered her plea, she understood that "she would be *entitled* to release after seven and one-half years, provided that she behaved properly in state prison" because of statements made by "her counsel and by the deputy district attorney" at the time of her plea. Further, she explained, she had never been advised that she would be placed on lifetime parole after release from prison. The superior court denied her petition on the same day that it was filed, citing only "page 4 of the plea transcript."

Immediately thereafter, Fox filed another habeas petition, this time with the California Court of Appeal. Once again, she advised the court that the prosecutor had told her that "she could not serve more than 7-1/2 years of actual incarceration unless she failed to 'behave herself' in state prison" and that "until recently, [she] ha[d] been unaware that

her sentence entail[ed] a potential life-long period of parole." She *did not* request withdrawal of her plea. Instead, she told the court that her "*sentencing* was unlawful," and that she wished the matter to be "remanded for resentencing."

The resolution of these petitions should have been simple. At the time, *Santobello v. New York*, 404 U.S. 257 (1971) had been the law of plea bargains for over a decade. In that case, the Supreme Court held that plea bargains were entitled to constitutional protection, and that "when a plea rests in any significant degree on a promise or agreement of the prosecutor . . . such promise *must be fulfilled*." *Id.* at 262 (emphasis added); *see also Buckley v. Terhune*, 441 F.3d 688, 694 (9th Cir. 2006) (en banc) ("Under *Santobello v. New York*, 404 U.S. 257, 261–62 (1971), a criminal defendant has a due process right to enforce the terms of his plea agreement."). Further, when the government breaches its promise, the courts have an independent duty to determine that the defendant receive what he is "reasonably due." *Santobello*, 404 U.S. at 262. That is to say, it is the constitutional responsibility of the courts to determine whether, under the circumstances of the case, the defendant should receive specific performance of his plea agreement or be given the opportunity to withdraw his plea. *Id.* at 264; *see also id.* at 267 (Douglas, J. concurring) ("One alternative may do justice in one case, and the other in a different case."). Despite the State's clear breach of the plea agreement in this case, however,[1] neither the superior court nor the court of

---

[1] Although there has been some debate as to whether Fox was promised merely consideration for parole in seven and one-half years or entitlement to parole (assuming good behavior) in seven and one-half years, in either case the State had breached the agreement by informing her that she would not even be considered for parole until she had served ten years in

appeal ever conducted a *Santobello* inquiry to determine the appropriate remedy for the breach of Fox's plea agreement. Instead, both summarily dismissed Fox's petition.[2]

## B. 1989 Habeas Petitions

Three years later, Fox again petitioned the superior court for a writ of habeas corpus, this time with new counsel. In contrast to her earlier petition, Fox's new counsel asked to have her guilty plea set aside on the ground that there had been newly discovered evidence exonerating her of the murder, and that her prior counsel had ineffectively advised her about a potential duress defense. Shortly thereafter, Fox replaced her counsel, because the woman had "what appeared to [Fox] like a nervous breakdown" when she had began "cracking up and laughing" and "talking to herself" in the courtroom.

The replacement counsel filed a supplemental brief in support of Fox's petition in which Fox asked to have her

---

prison. Because the state court of appeal found in the course of a later appeal that the promise was one of entitlement to release in seven and one-half years, that term is used to describe the promise throughout this dissent.

[2] Although a copy of the state court of appeal's denial is not on record, both parties have stipulated that the petition was denied as "unripe"—a highly questionable proposition considering that Fox had been informed that her minimum eligible parole date was set for 1994, which would require her to spend at least ten years in prison before being considered for parole. This strongly indicates that the State had anticipatorily breached the plea agreement. Any state law to the contrary would unduly burden Fox's attempt to vindicate her constitutional rights, as it would require her to remain in prison longer than her promised sentence, and continue to remain in prison, while state courts resolved her claim.

guilty plea set aside on two bases. The first ground for relief was that Fox's plea was involuntary because she "did not understand that her period of confinement would exceed seven and one-half years with good prison behavior." Although Fox's petition termed the plea "involuntary," the context of her argument shows that she was actually asserting that the State was applying a plea agreement to which she had not agreed and that it had breached its agreement as to the true plea. The plea was involuntary only to the extent that the court deemed it to be the agreement that the State claimed it to be (i.e., no promise of eligibility or entitlement to parole after seven and one-half years had been made). The plea was breached, however, if the terms were what Fox asserted they were and what they actually were: that a promise of entitlement for parole was part of the plea agreement. As the excerpt of the sentencing hearing described, and as the California Court of Appeal later found, under the agreement that Fox actually entered into, her incarceration could *not* exceed seven and one-half years with good behavior; instead, she would be paroled at that time. *See Brown v. Poole*, 337 F.3d 1155, 1159–62 (9th Cir. 2003). Thus, the State's refusal to even consider Fox for release until she had served ten years in prison did *not* render Fox's plea involuntary, but rather, constituted a breach of the plea agreement. *See Puckett v. United States*, 556 U.S. 129, 137 (2009) ("When the consideration for a contract fails—that is, when one of the exchanged promises is not kept—we do not say that the voluntary bilateral consent to the contract never existed . . . we say that the contract was broken."). That Fox sought to "withdraw" her purportedly "involuntary" plea on this basis makes it plain that Fox was seeking to "withdraw" only from the terms of the agreement that the State was attempting to impose upon her unilaterally, not from the terms of the true agreement. Moreover, as is explained below, a request to

withdraw includes a request to enforce in cases in which a plea agreement has been breached by the State. *See* discussion *infra* at 53–67. The second ground for relief alleged in the supplemental petition was that Fox had not been advised that she faced a potential lifetime period of parole after her sentence.

A hearing was held in July 1989 at which the prosecutor denied that Fox had *ever* been promised that she could be released on parole in seven and one-half years. Indeed, it was disclosed at the hearing that Fox had been assigned a minimum release date in 1994—which would require her to spend at least ten years in prison before even being considered for parole, despite the terms of her agreement. The superior court then granted Fox's petition on an entirely different basis, holding that her plea was involuntary because she had not been advised of the lifetime parole period, and ordered that Fox's entire plea be set aside. It did so without reaching the question of whether the State had breached the agreement or whether, if a breach occurred, withdrawal or enforcement would be the appropriate remedy. Indeed, it announced its decision without ever asking Fox if she had a preferred remedy for the breach, or attempting to determine whether her request to "withdraw" her plea after she had already served a substantial portion of her sentence was knowingly, intelligently, and voluntarily made. Instead, upon announcing its decision, it immediately set a trial date.

## C.  *Trial, Sentencing, and Appeal*

Twice before trial—once two years before the jury was empaneled, and another six months before that time—Fox filed motions asserting that the court should not have withdrawn her plea because, under *Santobello*, specific

performance was a remedy that the court should have considered. (In fact, in Fox's case, it was the only appropriate remedy.) At the time of her second motion, Fox had served virtually the entirety of the sentence she had been promised would be her maximum, assuming good behavior. In its opposition, the State continued to maintain that Fox was never promised that she would be entitled to parole in seven and one-half years, and that under California law it had never been possible for her even to be eligible for parole in seven and one-half years. The superior court denied both of Fox's motions without comment and in a form order. On January 28, 1992, a jury convicted her of first degree murder and first degree burglary, charges which the State had previously dropped pursuant to the terms of the plea agreement that it breached. At this time, of course, Fox had served the entirety of the promised seven and one-half year term.

Before sentencing, Fox once again asked that she be given the benefit of her bargain. As she explained, she had been promised parole in seven and one-half years in exchange for her testimony against her co-defendant and her plea of guilty, but had been denied the benefit of her bargain by the State after she had complied fully with her promise. The due process clause, she argued, required that she be given an appropriate remedy for the breach of the promises made to her, but, she asserted, she did not receive such a remedy. Instead, after serving almost the full seven and one-half years, just months before she was entitled to release, the state court subjected her to a trial on a more serious charge—a charge on which the State had promised it would not prosecute her. That prosecution was in no way just or fair. As she told the court in her brief, "[e]ven if acquitted she had already done the time she bargained for in the beginning." The State, she argued, got what it bargained for, and should be "estopped"

from denying the same to Fox after she had detrimentally relied on its promises throughout her years in prison. Further, she contended, since the superior court had already vacated her plea—she should be allowed to plead to a lesser charge that would give effect to the original agreement of the parties in compliance with California law. The court denied her motion and sentenced her to life imprisonment without the possibility of parole.

Fox appealed and again argued that under *Santobello* she was constitutionally entitled to a remedy for the breach of her plea agreement, and that "[a]fter she had served in excess of 7 ½ years, it was unjust" for the court to allow her only the option of withdrawing her plea; in doing so, she contended, it offered her no remedy; rather it presented her with the fundamentally unfair choice of either accepting a sentence that increased the period of incarceration provided for by her original agreement or going to trial in which case she faced even far greater punishment if convicted. She argued that rather than a coerced withdrawal, she should have been given specific performance as the only appropriate remedy for the State's breach of the plea agreement.

In response, the State did not deny its promise to Fox, nor did it claim—as it had in the past—that its promise to her was unenforceable under California law. Instead, it admitted for the first time that, pursuant to the plea agreement, Fox was to serve "about 7 ½ years," but asserted that its promise was now unenforceable because the court had withdrawn Fox's plea agreement at her request.

In its unpublished 1994 decision, which the State contends is the last reasoned decision and thus the decision

that we must examine under habeas law,[3] the state court of appeal agreed that Fox had been promised release in seven and one-half years. It found that Fox "bargained for[] a sentence of 15 years to life, *with a promise of parole in seven and one-half years*." Then, ignoring the fact that the State had repeatedly denied ever making this promise *and* that Fox's parole eligibility date had been set well after the expiration of her seven and one-half year term, the California Court of Appeal inexplicably found that the *only* reason Fox had asked to withdraw her plea was that "she didn't like the deal she'd made."[4] It then concluded that she had no right to the bargained-for sentence limited to seven and one-half years in prison, even though she had fulfilled her part of the bargain, because she had voluntarily rescinded the plea agreement. Fox again appealed, and the California Supreme Court denied her petition for review without comment.[5]

---

[3] *See*, *e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991).

[4] Fox, of course, *did* like the deal she had made. Although the court determined that she did not like the length of the parole term, her "deal" said nothing about the length of the term of parole that would follow her sentence, only that she would be released in the promised seven and one-half years. Fox had no problem with this deal—her problem was that the State continuously denied that she could or would be released in accordance with her deal. *See infra* pp. 45–49.

[5] As this court recently noted in *Curiel v. Miller*, the California Supreme Court must rule on a "staggering number of habeas petitions each year," and addresses this otherwise insolvable workload problem "by issuing unelaborated summary denials." *Curiel v. Miller*, No. 11-56949, Slip Op. at 7.

### D.  Post-Trial State Habeas Petitions

Following the denial of her direct appeal, Fox filed yet another habeas petition in superior court, once again raising her claim that she was entitled to specific performance of the original plea agreement.  She also asserted that her prior habeas attorney had provided ineffective assistance of counsel in seeking to set aside her plea in 1989 rather than seeking specific performance or resentencing.  Her petition was denied without comment or citation of authority.

Fox again returned to the California Court of Appeal, which remanded for an evidentiary hearing on the issue whether Fox received ineffective assistance of counsel by filing a habeas petition that resulted in her guilty plea being withdrawn.  In that hearing, the superior court limited its inquiry to the question whether counsel advised Fox about the risk that she could face a new trial or a longer sentence.  It did *not* examine whether the attorney should have advised Fox about her right to specific performance of her original bargain.

During the two-day hearing, Fox's former habeas counsel testified that he had asked to withdraw her plea because he believed that the District Attorney would offer a second plea bargain.  He further testified that he had declined to seek specific performance because he did not believe that the statements made about the promise of parole during Fox's sentencing hearing were "legally binding on The Court or the District Attorney."  Accordingly, he believed that asking for

withdrawal on the basis that Fox's plea was involuntary was a stronger argument.[6]

Fox's testimony revealed that the advice given to her by her habeas counsel was muddled at best. Specifically, she explained that, although she knew her 1989 habeas petition asked to have her plea "withdrawn," she understood that if that petition were successful, the court would give her the seven and one-half year period of incarceration that she had been promised. She testified that, on the basis of the advice of her counsel, she believed that the court would "adjust some kind of plea bargain" so that she could receive the promised seven and one-half years. Fox explained that she had been informed that by requesting "withdrawal" of her plea, she would enable the court to invalidate the terms of the bargain as the prosecutor wrongfully described them and that the court would then be able to enforce specific performance of the true agreement by allowing her to change her plea to that of a lesser charge, one which, under California law, would allow her to be paroled upon completion of the promised seven and one-half years.[7] Her testimony, in this respect is,

---

[6] That procedure, of course, could still obtain the same result as specific performance (a seven and one-half year term followed by parole) if Fox had been allowed to replead after the plea had been withdrawn. As described below, this appears to be the result Fox hoped to obtain.

[7] Although, as the majority reports, Fox was apparently also told that "if [she] went to trial" she could get a sentence of life without the possibility of parole, that statement is of little significance in light of the fact that Fox testified that she was also informed that, if her petition were successful, she would not have to take the case to trial and could, at the worst, choose the option of again pleading to second degree murder. She testified that she had been told that she "could always plead out to second-degree" which would come with a fifteen-years-to-life sentence. Indeed, she testified, her attorney told her that the opportunity to plead out to second-

of course, credible because the minimum ten year eligibility date for parole on which the State insisted was based on a provision of state law of which the prosecutor was apparently unaware when he promised her parole after seven and one-half years. Changing Fox's plea to a lesser charge would have enabled the State to comply with its own rules as well as with the Constitution.

The superior court denied the petition from the bench on June 2, 1999. Ignoring almost all of the facts set forth above, it found that Fox's habeas attorney was not ineffective because he had advised her that setting aside her plea agreement could result in a new trial that would expose her to a sentence longer than the one she was serving, "up to and including life without the possibility of parole." Subsequently, Fox once more moved her way through the hierarchy of the California courts. The California Court of Appeal denied her petition without comment, and the California Supreme Court denied it as untimely.

## E.  The Federal Petition

After two decades of litigation in the California courts, Fox finally turned naively to the federal judiciary. Proceeding pro se, she filed a habeas petition under 28 U.S.C. § 2254 on August 13, 2004. The State moved to dismiss the petition as untimely, but the district court held that Fox was entitled to equitable tolling based on the misconduct of her habeas lawyer who had resigned from the practice of law after masterminding what the California Court of Appeal

---

degree would "always" be "on the table." According to Fox, however, neither the prosecution nor the court ever gave her that opportunity or otherwise complied with the dictates of *Santobello*.

described (in another case) as a habeas corpus "writ mill," designed to "systematically . . . abus[e] the writ process for his own pecuniary gain." *In re White*, 121 Cal. App. 4th 1453, 1458 (2004).[8]

Originally, in October 2009, a magistrate judge issued a report and recommendation which concluded that Fox was

---

[8] Richard Dangler, the attorney in question, represented Fox through her third round of state habeas petitions, those that were filed after her trial. According to the district court, Dangler was paid $5,000.00 and it was agreed that he would promptly appeal any denial by the Los Angeles Superior Court, and then, if those petitions were unsuccessful, promptly file a federal petition within AEDPA's one year statute of limitations. Despite Dangler's assurances, it took him over 11 months to file a new petition in the state court of appeal, at which point he filed a petition that essentially simply copied the petition he had originally filed in the superior court. Following the court of appeal's denial, Dangler waited another 27 months to file a petition in the California Supreme Court, and again, filed a petition that simply mirrored the one that the court of appeal rejected. During this time, Fox wrote Dangler numerous letters about the length of time he was taking to file her petitions, and Dangler repeatedly assured her that she had nothing to worry about. After Dangler had resigned from the practice of law, *and* after the California Supreme Court denied Fox's petition as untimely, Dangler sent Fox a letter informing her that she should file another habeas petition in the California Supreme Court and that his associate, C. Roman Rector would be willing to represent her in connection with that petition at no charge, provided that Rector was retained to file a federal petition for $8,250.00. (Although this opinion refers to the process of going through the California appellate system after the completion of proceedings in the superior court as "appealing" the denial of a petition, the California system consists simply of filing a new petition with the next level of the judicial system. For almost all purposes, California treats the post-conviction petitions filed at the second and third levels as appeals. There is a difference not relevant here, however, in cases in which the order of filing the petitions is different, for example filing the first petition in the state supreme court, which is permissible under California law).

entitled to relief on her request for specific performance. The magistrate judge reasoned that Fox's agreement with the State plainly entitled her to be eligible for release on parole after seven and one-half years. Contrary to the opinion of the California Court of Appeal, the magistrate judge held that Fox clearly did not receive the benefit of her bargain. She did not, as the state court had reasoned, "decide[] she didn't like the deal she'd made," but instead sought relief because the State informed her that she was not going to receive the benefit of the deal she had made. Indeed, the magistrate judge found, the state court of appeal's decision was contrary to clearly established Supreme Court law *and* based on unreasonable determinations of the facts, and therefore failed even the highly deferential standard of review established under both 28 U.S.C § 2254(d)(1) and (d)(2). Further, the magistrate judge recommended, that since Fox had served more than five years of her promised seven and one-half year sentence at the time her plea was withdrawn in October 1989, the only appropriate remedy was to enforce, not withdraw, the bargain.

The State filed objections and the magistrate judge revised his report. In the amended report and recommendation, issued in March 2012, the magistrate judge ruled that Fox had not shown that the state court's decision was contrary to or an unreasonable application of clearly established Supreme Court *law*, and therefore could not survive the deferential standard of review established under 28 U.S.C. § 2254(d)(*1*). As explained *infra* Part II, such a finding would require that the federal court deny Fox relief *only if* she could not overcome the equally deferential standard set forth in 28 U.S.C. § 2254(d)(*2*), which governs unreasonable findings of *fact*. Inexplicably, however, although he had previously relied on both 28 U.S.C.

§ 2254(d)(1) and (d)(2) in his original report and recommendation, the magistrate judge did not address whether Fox met the standard with respect to unreasonable findings of fact under 28 U.S.C. § 2254(d)(2). The district court nevertheless adopted the revised report and recommendation, denied Fox's petition, and issued a certificate of appealability. This appeal timely followed.

## II. STANDARD OF REVIEW

The majority carefully avoids deciding whether the strictures of the Anti-terrorism and Effective Death Penalty Act ("AEDPA") requiring deference to the state court's decision apply here. That Act bars further review of any claim "adjudicated on the merits" in state court, unless the State's decision falls within an exception contained in 28 U.S.C. § 2254(d)(1) or (d)(2). *Harrington v. Richter*, 562 U.S. 86, 98 (2011). Those exceptions permit a grant of habeas relief in cases in which the relevant state-court decision is (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented to the State court proceeding." 28 U.S.C. §§ 2254(d)(1) and (2).

As the majority correctly states, AEDPA's limitations apply "to a single state court decision, not to some amalgamation of multiple state court decisions," and when more than one state court has adjudicated the claim, we analyze only "the last reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091, 1093 (9th Cir. 2005) (citing *Ylst*, 501 U.S. at 803–04). Thus, when a decision "does not disclose the reason for the judgment," we will "look through"

it and apply AEDPA deference to a prior decision on the merits. *Ylst*, 501 U.S. at 802. If the last reasoned decision states a procedural reason for the judgment, however, we ordinarily do not apply AEDPA deference and instead, review the claim de novo if the petitioner can show cause and prejudice to overcome the procedural default.

Here, the California Supreme Court's 2004 denial of Fox's petition rested on a procedural ground. The State, however, believes that we should "look through" that decision both because it has waived Fox's procedural default and because the procedural ground in question was merely a failure to file a timely petition, a ground that would not disturb the underlying decision on the merits. It therefore urges that we instead treat the 1994 court of appeal decision (which was the last decision to announce the reason for its judgment prior to the 2004 California Supreme Court's denial), as the last reasoned decision in this case. Because that decision addressed the merits of Fox's claim, it argues, we cannot grant relief unless that decision falls within one of the exceptions set forth in 28 U.S.C. § 2254(d).

I, like the majority, do not believe that we need to resolve the question of which opinion is the last reasoned decision in this case, and I, like the majority, apply de novo review to Fox's claim. I do so because, even assuming that we must, as the State urges, "look through" the California Supreme Court's timeliness decision and give deference to the 1994 court of appeal's resolution of Fox's claim on the merits, that decision is so unreasonable that it fails even AEDPA's highly deferential test, and therefore, de novo review applies. *See Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) (holding that, once the court has found that the state court's decision meets one of the exceptions listed in 28 U.S.C. § 2254(d),

"we evaluate the claim de novo"). Accordingly, even under the State's argument as to the last reasoned decision, de novo review applies.[9]

In this case, the California Court of Appeal plainly misapprehended, and indeed, ignored, material facts, and as a result based its decision on factual findings that are entirely unsupported by the record and are for that reason alone wholly unreasonable. It thus falls within the exception set forth in Section 2254(d)(2). *See Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013) ("[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.") (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)). Ironically, in resolving Fox's claim adversely, the California Court of Appeal determined that Fox had been promised "a sentence of 15 years to life, *with a promise of parole in seven and one-half years*," a critical factual finding that *was* reasonable and supported by Fox's representations as to her plea bargain, by the transcript of her sentencing hearing, and by the State's concession on appeal that under the plea agreement, Fox

---

[9] If the California Supreme Court's 2004 decision were the last reasoned decision, of course, Fox would not need to overcome either of the exceptions listed in 28 U.S.C. § 2254(d) because that decision was not a decision "on the merits." The normal course of action in such case is to allow the petitioner the opportunity to show cause and prejudice for his procedural default, and then, if such a showing is made, to review the claim de novo. Here, because the State has waived any argument that Fox's relief is procedurally defaulted, *Franklin v. Johnson*, 290 F.3d 1223, 1230 (9th Cir. 2002), we would proceed directly to the merits and review the claim de novo.

would serve "about 7 ½ years." The remainder of that court's resolution of Fox's claim, however, is riddled with unreasonable factual findings. Although it agreed that Fox had been promised parole in seven and one-half years, it wrote that Fox "got what she bargained for," and that she asked to have her deal set aside only because she "didn't like the deal she'd made." Those findings not only directly conflict with the court's immediately preceding finding as to the contents of Fox's plea bargain, but could be made only by ignoring or overlooking substantial portions of the record, the State's concession, and all of the evidence of the State's breach of its plea agreement.

Contrary to the state court of appeal's findings, the record clearly reflected that at the time she filed her 1989 petition, Fox was not, in fact, going to get what she bargained for. As described above, in both her 1986 and 1989 petitions, Fox asserted that she had pleaded guilty after the deputy district attorney promised that she would be released on parole, assuming good behavior, after seven and one-half years, and that only after she was in the midst of serving her sentence was she informed that she could not even be considered for release at the bargained-for time. Specifically, she asked to withdraw her plea only after representatives from the State informed her that the prosecutor had made a false promise and that, under California law, she could not receive the benefit of her bargain. Indeed, as her 1989 petition made clear, she filed her petitions for relief because she was informed by the State that her "minimum eligible release date [wa]s almost ten years, contrary to seven and one-half years as stated by [the] Deputy District Attorney." In fact, in responding to Fox's petitions, the prosecution had taken the position that Fox could not be considered for parole until she had spent at least ten years in prison, and that any promise

made to the contrary was contrary to California law. The state court of appeal, however, ignored this and all other evidence that showed that Fox was *not*, in fact, "g[etting] what she bargained for."

Indeed, the state court of appeal did not even mention that Fox sought relief in her 1989 habeas petition on the basis that she was not going to receive parole after seven and one-half years of incarceration as the State had promised. Instead, it wrote that there were only two bases for Fox's 1989 petition (that she had not been fully advised of the consequences of her guilty plea, and that she had been ineffectively advised about her potential duress defense) while ignoring the primary, most substantial and repeatedly asserted basis for Fox's habeas petition (that she was being forced to remain in prison for at least ten years, in violation of the prosecutor's promise regarding parole). Without wholly ignoring this primary ground and the evidence that supported it, the court of appeal could not have concluded that "[f]ive years into her sentence (with only two and one-half years to go), Fox decided she didn't like the deal she'd made." The record shows exactly the opposite: Fox sought relief not because she did not like the deal she had made, but because the State refused to acknowledge the deal into which it had entered and also contended that it lacked the power to deliver on its part of the bargain.

The state court of appeal also unreasonably found that Fox was granted "the relief she so desperately wanted"—withdrawal of her plea and a trial at which the State could try to prove the charges against her. Fox's pre-trial motions, which were filed *well* in advance of the actual trial, make clear that a new trial was not the relief she desired. She tried vigorously to avoid a new trial and sought

reinstatement of all parts of the plea bargain that she insisted she had made. This was not a case in which the defendant gambled a life in prison in the hope of being acquitted and later regretted the outcome. It was one in which the defendant had, from the very beginning, surrendered her right to trial in exchange for a promise of parole after serving seven and one-half years of imprisonment and, for decades thereafter continuously sought to enforce that promise. The state court of appeal, however, did not even discuss the contents of Fox's pre-trial attempts to secure a remedy consistent with her original plea bargain.[10]

Most troubling, the state court of appeal unreasonably found that Fox's "predicament"—that is, a lifetime in state prison without the possibility of parole—was "entirely a result of her own actions without any fault of the prosecutor or the court." Indeed, it stated, the prosecutor "did nothing to breach the plea agreement." The record clearly and affirmatively establishes, however, that Fox's "predicament" was, in fact, exclusively the fault of the State. Fox pleaded guilty on the basis of the prosecutor's representations that she would be paroled in seven and one-half years, assuming good behavior. As it turned out, however, the prosecutor had misinformed her on that critical point. Whether through negligence or incompetence, the prosecutor failed to inform

---

[10] Both the majority and the concurrence apparently agree with the state court of appeal that Fox "got what she asked for" when the state court withdrew her plea. The facts and extensive procedural history of this case make clear, however, that Fox had, at all times, sought to receive the benefit of the bargain she had originally made. *See supra* at pp. 30–40; *see also infra* at pp. 61–64. Further, as explained *infra* pp. 53–67, because the State had breached its promise to Fox, the state courts had a duty to independently determine the appropriate remedy for this breach, which the courts did not do here.

Fox that state law prohibited a release at the promised time. After she had performed her part of the bargain, Fox learned, from a representative of the State, that, contrary to the prosecutor's promise, she would not be paroled until she had spent at least ten years in prison. When she tried to explain her "predicament" to the State and to its judiciary, the prosecution falsely denied ever making such a promise, and further denied having the authority to do so. The state court of appeal ignored all of this critical information when determining that "her predicament [was] . . . without any fault of the prosecutor," and that the prosecutor "did nothing to breach the plea agreement."

The evidence that the California Court of Appeal ignored was vital to Fox's claim. The entire basis of her appeal was that she was entitled to specific performance of the State's obligations following her performance of her part of the bargain and that the court had unlawfully withdrawn her plea after the State's breach without offering her that option. The state court of appeal had before it, "yet apparently ignore[d]," all the evidence that was central to Fox's claim that the State had breached the plea agreement. Thus, we do not accord AEDPA deference to its decision. *See Milke*, 711 F.3d at 1008–1010. Rather, we must review Fox's claim de novo. *See Hurles*, 752 F.3d at 778 ("If we determine, considering only the evidence before the state court, that the adjudication of a claim on the merits . . . was based on an unreasonable determination of the facts, we evaluate the claim de novo, and we may consider evidence properly presented for the first time in federal court.").[11]

---

[11] In the alternative, I would also find that the California Court of Appeal decision was contrary to and an unreasonable application of clearly established Supreme Court law because it made no mention of, or

### III.  DISCUSSION

The enforcement of promises that are made in exchange
for defendants' waivers of their freedom is a matter of sound
public policy and profound constitutional importance.  Well
over ninety percent of criminal convictions are based on plea
bargains, and each of those convictions depends on public
faith in the integrity of the government's promises.  More
important, defendants surrender their fundamental rights and
liberties in exchange for these promises, and robust
constitutional protections must be in place to ensure that the
entirety of the plea process is just and fair.  *See, e.g.*, *Missouri
v. Frye*, 132 S. Ct. 1399 (2012); *Santobello*, 404 U.S. 257.
Accordingly, a guilty plea vests the defendant with "a due
process right to enforce the terms of his plea agreement,"
ensuring protections for his sacrifice of fundamental
freedoms and for the integrity of the government's word.  *See
Buckley*, 441 F.3d at 694 (citing *Santobello*, 404 U.S. at
261–62); *see also Cuero v. Cate*, 2016 WL 3563660 (9th Cir.
June 30, 2016); *Doe v. Harris*, 640 F.3d 972, 975 (9th Cir.
2011) ("Under the Due Process Clause, criminal defendants
have a right to enforce the terms of their plea bargains.");
*Brown*, 337 F.3d at 1159 (9th Cir. 2003).

This case, which comes before us after decades of
litigation, started off with a relatively simple premise that

---

reference to, California contract law in determining whether the State had
breached its promise.  *See Ricketts v. Adamson*, 483 U.S. 1, 5 n.3 (1987);
*see also Buckley*, 441 F.3d at 695 ("Thus, under *Adamson*, California
courts are required to construe and interpret plea agreements in accordance
with state contract law.").    In addition, I believe that it was an
unreasonable application of *Santobello* to fail to analyze whether specific
performance was the more appropriate remedy for the State's obvious
breach.

should have had a relatively simple resolution. In exchange for Fox's agreement to waive her fundamental right to a trial by a jury of her peers and her agreement to testify against her co-defendant, the State promised her that she would be paroled, assuming good behavior, in seven and one-half years. Then, after it received everything it needed from her—her testimony and her freedom—the State breached its promise. It informed her that she would not be considered for parole until she had spent at least ten years in prison, and indeed, denied ever agreeing to anything different. After this breach, Fox had an indisputable right to enforce her plea bargain.

While the majority correctly states that Fox's counsel did not expressly request specific performance until after her plea had already been withdrawn, in her 1986 petition to the California Court of Appeal, she had contended that her sentencing was unlawful and had requested that the case be remanded for *resentencing* in accordance with her plea. Further, under *Santobello v. New York*, state courts have a duty to determine whether due process requires specific performance of the broken plea agreement, regardless of whether the defendant expressly requests only withdrawal. 404 U.S. at 262; *id.* at 267 (Douglas, J. concurring). In this case, the state courts did not consider the appropriate remedy for the State's breach of the plea, and indeed, did not even acknowledge the fact that the State breached its agreement. Instead, the Los Angeles Superior Court withdrew Fox's plea agreement and forced her to go to trial after she had already delivered the consideration required by her plea bargain and had served the majority of the promised seven and one-half years. As a result of the court's rulings and the State's continuing misrepresentations, Fox was condemned to pursue a series of legal actions that resulted in her being where she

is today—behind bars for life, in violation of the State's promise.

Had the state court fulfilled its obligation to determine the appropriate remedy for the breach the first time Fox requested relief, it undoubtedly would have concluded, as has every court that has faced the question, that under the circumstances, the only remedy that satisfies the demands of due process is specific performance of the breached plea agreement. *See, e.g., Cuero*, 2016 WL 3563660; *Brown*, 337 F.3d at 1161. Although, in making the determination of the proper remedy, "considerable" weight must be given to the defendant's specific request, that weight is of no force unless the court is satisfied that the defendant understands and has considered the effects of choosing one option rather than the other. Here, the court never presented Fox with her options, nor did it assure itself that her waiver of the right to specific performance was knowing, intelligent, and voluntary. To the contrary, the record shows that Fox's request for "withdrawal" was coerced and that, given the choice, she, like any other rational person, would have selected specific performance. Indeed, the transcripts from her 1999 evidentiary hearing show that the only reason she sought to "withdraw" her plea was so that she could be given the opportunity to plead to a lesser charge, one that would entitle her to the promised seven and-one half years without causing the State to violate California law. In short, she wanted specific performance all along.

The majority apparently believes that, simply because Fox's plea was withdrawn—by unconstitutional means or otherwise—there is nothing we can do to fix this injustice. That is incorrect. *See Cuero*, 2016 WL 3563660 (holding that a defendant may be given the benefit of his original bargain

even after the plea has been withdrawn). In my view, the state courts acted arbitrarily, unreasonably, and contrary to law by withdrawing Fox's plea without conducting an adequate inquiry as to the appropriate remedy for the State's breach. Fox was entitled to a meaningful remedy, and as every court since *Santobello* has concluded, withdrawal *cannot* remedy a breach when a defendant has, like Fox, already cooperated with the government or served a substantial portion of her sentence. Because Fox did not knowingly, intelligently, and voluntarily waive her constitutional right to that remedy, her 1992 conviction—which was secured over her objections and in violation of her rights—cannot stand. Specific performance of the original bargain should now be granted, and Fox, who has served a sentence exponentially in excess of the seven and one-half years that she was promised, should be released immediately.

## A. Fox had a Constitutional Right to Enforce the Terms of her Agreement after the State's Breach

In *Santobello v. New York*, the Supreme Court first held that "when a plea rests in any significant degree on a promise or agreement . . . such promise must be fulfilled." 404 U.S. at 262. There, New York prosecutors struck a deal with a defendant, and promised that if he pleaded guilty to a lesser-included offense, the prosecutor would make no recommendation as to the defendant's sentence. *Id.* at 260. After considerable delay in scheduling his sentencing hearing, the petitioner sought to withdraw his guilty plea. In turn, a new prosecutor neglected his predecessor's promise, and recommended the maximum sentence allowable. *Id.* The Supreme Court held that the defendant was constitutionally entitled to a remedy for the prosecutorial breach. *Id.* at 264.

It then remanded to the state court to determine "whether the circumstances of this case" and the "interests of justice" required specific performance of the promise, in which case the petitioner would be resentenced, or withdrawal of the plea, the relief sought by the petitioner. *Id.* As Justice Douglas explained in his critical concurrence, "[o]ne alternative may do justice in one case, and the other in a different case." *Id.* at 267.[12]

When Fox sought to enforce her bargain, *Santobello* had been the governing law with respect to plea bargains for over a decade. Fox's habeas petitions made clear that her plea rested in significant part on the prosecutor's promise that she would be entitled to parole in seven and one-half years, but that she had been expressly advised by prison authorities that she would *not* even be considered for parole at the agreed-upon time. In fact, she had been informed by state authorities that she could not be made eligible for parole until after ten years. Thus, it was clear that the State had no intention of keeping its promise. Indeed, state prosecutors repeatedly denied ever agreeing to the evident terms of their bargain.

---

[12] *Santobello* was decided 4–3, with Justice Douglas's concurrence serving as the critical fourth vote. (From September 1971 until roughly one month after *Santobello* was decided in December 1971, the Supreme Court functioned with only seven justices. This was not a result of any Senate obstructionism, however. Rather, in September 1971 Justice Black resigned, and six days later, Justice Harlan died). The dissenting justices did not disagree with the Court's central holding that the constitution guarantees a remedy for broken plea bargains. Instead, they believed that, in this case, the defendant needed to be permitted to withdraw his guilty plea, particularly because, unlike Fox, he had not yet been sentenced for the crime. Thus, in *Santobello*, withdrawal would have had minimal, if any, prejudicial effect on either the defendant or the State.

Thus, under *Santobello*, Fox had a constitutional right to a meaningful remedy for the State's breach, and the state courts had a duty to ensure that Fox received what she was "reasonably due"—to determine whether, under the circumstances of this case, the interests of justice required specific performance of the bargain or withdrawal of her plea. The state courts declined to do so. There is no indication that, at any point in the decades-long state proceedings, the state courts ever considered what remedy would appropriately rectify the State's breach or that they ever considered specific performance. By failing to do so, the State denied Fox the remedy to which she was constitutionally entitled: specific performance of her plea agreement.

## B. The Only Appropriate Remedy for this Breach was Specific Performance

Had the State inquired into the appropriate remedy for the breach of Fox's plea agreement, it undoubtedly would have come to the conclusion that the *only* appropriate remedy in this case was to grant specific performance. Fox had fulfilled her end of the bargain. She testified for several hours against her co-defendant and, by all accounts, comported herself as a model inmate in the years she spent in prison before filing her habeas petitions. Unlike the defendant in *Santobello* who had not yet been sentenced at the time of the breach, *see* 404 U.S. at 259–60, Fox had already forfeited her freedom and spent a substantial amount of time in prison before she learned of the state's breach. In these circumstances, as courts across the country had recognized at the time of Fox's petitions, specific performance was the *only* just and meaningful remedy. Withdrawal simply would not provide the return to the status quo that a proper remedy requires because "[e]radicating the impact of [Fox's] testimony is

impossible," and giving her the opportunity to replead after such a long confinement is, at best, "superficial and unrealistic." *Geisser v. United States*, 513 F.2d 862, 871 (5th Cir. 1975); *see also United States v. Finkbeiner*, 551 F.2d 180, 184 (7th Cir. 1977) ("Under the circumstances of this case it would be unjust to simply vacate the guilty plea, which theoretically would allow the state to reindict [the defendant.] Since he has already performed his side of the bargain, fundamental fairness *demands* that the state be compelled to adhere to the agreement as well.") (emphasis added); *United States v. Duff*, 551 F.2d 185, 187 (7th Cir. 1977) ("Since Ferris has substantially begun performing his side of the bargain, it would not be fair to vacate the plea and require him to go through the procedure anew."); *Palermo v. Warden*, 545 F.2d 286, 296–97 (2d Cir. 1976) ("Remand for withdrawal of the guilty plea would indeed have been meaningless[.]"); *Krager v. United States*, 388 F. Supp. 595, 599 (D. Mass. 1975) ("To vacate [the defendant's] plea, after he has already served more than four years, would be an empty gesture."); *State v. Tourtellotte*, 88 Wash. 2d 579, 585 (Wash. 1977) (en banc) ("If we do not enforce the agreement, the state would be permitted to play fast and loose with an accused's constitutional rights to its advantage and his detriment.") (internal quotation omitted).

The three decades that followed have only served to reinforce the notion that when a defendant has already served a substantial prison term or has already provided the bargained-for cooperation with the government, specific performance is the *only* remedy for the governmental breach. Indeed, this court held as much in *Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003), a case remarkably similar to this one. There, as here, a petitioner in California custody had been promised parole eligibility in seven and one-half years

despite the fact that state law required her to be in prison for at least ten years before being considered for parole. Although the agreement was evident on the face of the state court transcripts, the State asserted that the prosecutor had no right to, and in fact did not, promise eligibility for or entitlement to parole in seven and one-half years. In *Brown* we held that the petitioner was "entitled to a remedy" for the breach of her plea agreement, and that because she "ha[d] met the terms of the agreed-upon bargain, and paid in a coin the state cannot refund," "[r]escission of the contract [wa]s impossible[.]" *Id.* at 1161. Accordingly, specific performance was "the only viable remedy." *Id.*; *see also Buckley*, 441 F.3d at 699 (holding that, in similar circumstances, "[r]escission of the plea agreement cannot repair the harm caused by the state's breach").[13]

Even more recently, in *Cuero v. Cate*, this court held that a defendant who has performed his part of the bargain is entitled to specific performance after a state's breach *even after* he has already withdrawn the bargain. 2016 WL 3563660. There, the defendant pleaded guilty to two felonies pursuant to an agreement with the state that he would receive a maximum of 14 years, 4 months in prison and 4 years of parole. *Id.* at *1. After he pleaded guilty, the state prosecutor

---

[13] This is also the approach that has been taken by state courts that have followed *Santobello*'s mandate and inquired as to whether specific performance is an appropriate remedy. *See, e.g.*, *Shanklin v. Commonwealth*, 730 S.W. 2d 535, 537 (Ky. Ct. App. 1987). This has been true even where, as here, the plea agreement was originally erroneously set aside. *See Brooks v. Narick*, 243 S.E. 2d 841, 843 (W.V. 1978) ("We hold that withdrawal of his guilty plea was a coerced act caused by the state's breach of the plea bargain, and Brooks is entitled to reinstatement of the guilty plea and specific performance of the agreement.").

moved to amend the criminal complaint to allege additional prior charges which, if allowed, would result in an indeterminate 64 years to life under California's three strikes law. *Id.* at *2. This amendment clearly breached the plea agreement and undoubtedly violated the defendant's rights, but the California Superior Court permitted it, and as a result, Cuero withdrew his guilty plea. *Id.* As we explained, allowing Cuero to withdraw his guilty plea "was no remedy at all" because it did not "'repair the harm' caused by the prosecutor's breach." *Id.* At *7–8. To the contrary, we explained, the withdrawal "exposed Cuero to the risk of going to trial and receiving an indeterminate 64 years to life sentence. This is hardly the 'remedy' Cuero would have elected had he been given a choice." *Id.* "Because Cuero had already performed, 'fundamental fairness demands that the state be compelled to adhere to the agreement as well.'" *Id.* at *8. Further, we explained, specific performance was "necessary to maintain the integrity and fairness of the criminal justice system" because "'[i]f a defendant cannot rely upon an agreement made and accepted in open court, the fairness of the entire criminal justice system would be thrown into question. No attorney in the state could in good conscience advise his client to plead guilty and strike a bargain if that attorney cannot be assured that the prosecution must keep the bargain.'" *Id.* at *8 n.14. (quoting *State v. Tourtellotte*, 564 P.2d 799, 802 (Wash. 1977) (en banc). In other words, because withdrawal of the plea bargain had been coerced by the State's breach and because withdrawal was an inadequate remedy for that breach, specific performance of the withdrawn plea was required.

The majority believes that *Cuero* is distinguishable because of the procedural posture of that case, namely, that Cuero initially argued breach and sought specific

performance in state habeas court. That distinction, however, is without a difference. Here, as in *Cuero*, the state breached its agreement, and here, as in *Cuero*, the breach resulted in the withdrawal of the plea agreement. In both cases, the withdrawal "exposed" the defendant to the fundamentally unfair risk of a potential life sentence. In both cases, the withdrawal of the plea was meaningless, as it afforded "no remedy." *See id.* at \*7. Accordingly, in both cases the proper result as a matter of law was to enforce the original terms of the bargain, not to withdraw the plea. In *Cuero*, however, we reinstated the defendant's withdrawn bargain, and here, we do not. Put simply, the majority's theory that withdrawal of the plea "nullifies" the defendant's ability to specifically enforce a bargain, even though the withdrawal had been coerced by the State's breach, is inconsistent with our holding in *Cuero*.[14]

In short, in every case to have addressed the question, courts have recognized that, when the State breaches its plea

---

[14] Indeed, the difference between the procedural posture in *Cuero* and this case is not so great as the majority suggests. Both requested specific performance only after their plea had already been withdrawn. In *Cuero*, the defendant pleaded guilty to the charges in the amended complaint subsequent to the withdrawal of his original plea, but before he requested specific performance. *See id.* at \*2 ("[T]he Superior Court allowed Cuero to withdraw his guilty plea and enter a new plea agreement[.]"); *see also Cuero v. Cate*, 2011 WL 7769328, at \*2 (S.D. Cal. 2011) (explaining that, subsequent to the amended complaint "Cuero withdrew his previous guilty plea, and entered into a negotiated plea to the charges contained in the . . . amended complaint, admitted two prior felonies contained therein, and a stipulated 25-years-to-life-sentence."). Cuero did not request specific performance until his post-conviction habeas petition before the California Court of Appeal. *See Cuero*, 2011 WL 7769328, at \*6. In contrast, Fox first requested specific performance at an even earlier procedural stage: after the withdrawal of her plea, but before her subsequent conviction at trial.

agreement after the defendant has already substantially performed his part of the bargain, withdrawal of the plea is *no remedy* at all. Accordingly, by failing to give Fox specific performance of her bargain and instead withdrawing her plea, the State denied her the constitutional remedy to which she was entitled.

The majority would apparently distinguish all prior reported cases on the patently erroneous assumption that Fox voluntarily decided in 1989 to abandon the plea deal the State had guaranteed her in order to seek to establish her innocence in a new trial. It simply defies all logic and reason to believe that Fox, having bargained for her release on parole following seven and one-half years of imprisonment, having delivered the testimony the State demanded in return for her relatively short period of incarceration, and having served five years of that seven and one-half year term, would have voluntarily decided to refuse to serve her remaining two and a half years in order to undergo a new trial on a more serious charge with a possible, indeed almost certain, term of life without parole. This is particularly obvious as she had little if any evidence of innocence, had never seriously denied her guilt, and the evidence of that guilt was overwhelming. Under a proper reading of the record in this case, nothing whatsoever supports the majority's counter-factual conclusion or suggests so unlikely and irrational an intent on Fox's part. Rather, at all times her effort was to obtain, by one means or another, the state-promised limitation of seven and one-half years to the sentence she was serving and was close to completing. *See supra* pp. 39–40; *see also infra* pp. 61–64.

## C. The State is not Excused from its Obligation to Provide A Meaningful Remedy by the Coerced Withdrawal of Fox's Guilty Plea

The majority believes that the State's withdrawal of Fox's plea was appropriate because that was the remedy she sought. There are several problems with this conclusion. First, it is directly contrary to *Santobello*, which held that the remedy must be selected by the state court based on the circumstances of the case, *not* dictated solely by the defendant's request. *Santobello*, 404 U.S. at 262–63; *id.* at 267 (Douglas, J. concurring). Although a defendant's request for a specific remedy is to be given "considerable" weight, that choice is meaningless where, as here, the court does not know whether the defendant has been fully advised of the possible options and where the court has failed to determine the voluntariness of the defendant's request. Second, the context of Fox's request for withdrawal shows that she did not want to withdraw the plea to which she had agreed, or to face trial on the charges to which she had pled, let alone to a more serious charge on which the State had agreed not to prosecute her. Rather, she believed that her motion to "withdraw" from the State's version of the agreement would allow her to replead to an offense that would ensure that she would receive the benefit of her bargain. Third, Fox's request for "withdrawal" was coerced by the State's false representations regarding the nature of the plea agreement—she would not have filed a petition at all if not for its repeated false denials of its promise to her. Finally, as already discussed, specific performance was the only proper remedy for the State's breach under the circumstances of the case. Fox's request for a different remedy constituted, at most, an involuntary, unknowing, and uninformed waiver of her constitutional right to the only true remedy: specific performance. The "waiver"

thus is void, or at the least voidable, and cannot serve as the basis for denying Fox the constitutional remedy to which she is entitled.

Under *Santobello*, courts have an obligation to determine independently which remedy comports with due process and fundamental fairness, regardless of the defendant's initial request.[15]  *Id.* at 262–63; *id.* at 267 (Douglas, J. concurring). Indeed, a number of cases since *Santobello* have recognized that due process requires specific performance in circumstances similar to Fox's: i.e., in cases in which the defendant initially requested withdrawal of his plea. *See, e.g.*, *Cuero*, 2016 WL 3563660; *Duff*, 551 F.2d at 186–87; *Brooks*, 243 S.E. 2d at 843.

Of course, as Justice Douglas's critical concurrence in *Santobello* suggests, a defendant's choice of relief should ordinarily be given "considerable" weight in determining which remedy due process requires, but that choice is without force unless it was voluntarily, knowingly, and intelligently

---

[15] This requirement serves a practical purpose.  That withdrawal of the plea is, in cases like Fox's, not a constitutionally valid remedy is now established.  Thus, a defendant who requests withdrawal may, in fact, be waiving a right to which he is constitutionally entitled.  Judges, who understand the consequences, legal and practical, of particular remedies, are in the best position to ensure that the defendant understands his options and constitutional rights before the plea is withdrawn—just as a judge must ensure that the defendant understands his options and his constitutional rights before his plea of guilty is accepted in the first place. In fact, in many cases, the judge may be the *only* person capable of ensuring that the defendant understands his options, because many defendants are not represented by counsel during state collateral proceedings.  Moreover, those who are represented are not afforded constitutional protection against the incompetence of their counsel. *See Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987).

made. Here, although Fox asked to "withdraw" the plea, the context makes clear that she wished to "withdraw" only from the terms of the agreement that the State sought to unilaterally enforce against her, not from the plea bargain as she (correctly) understood it. Her petition stated that she "did not understand that her period of confinement would exceed seven and one-half years with good prison behavior." The truth was, of course, that her confinement *could not*, under the terms of the actual plea agreement, be longer than seven and one-half years with good behavior. *See Brown*, 337 F.3d at 1161. Indeed, the state court of appeal found as much following the State's concession on Fox's direct appeal. It was only under the State's fallacious version of the agreement, which it attempted unilaterally to enforce against her, that Fox could be imprisoned for longer than seven and one-half years without parole.

Fox simply had no objective reason to seek to invalidate the actual plea agreement that promised her parole after the agreed-upon period, nor is there any reason to believe that she would have agreed to do so but for the State's breach of its promise. At no point prior to withdrawal did the superior court ask Fox whether she wished to withdraw her plea and face the possibility of trial or whether she wished to seek specific enforcement. Further, as she testified at the 1999 hearing, she believed her motion to "withdraw" would guarantee her the mutually agreed-upon seven and one-half years by allowing her to receive the opportunity to replead to a lesser offense—one that would permit compliance with California sentencing law while still allowing her the promised limited term of imprisonment. Indeed, shortly after the court withdrew Fox's plea, she moved for specific performance, making clear that she had only sought to "withdraw" from the plea that the State represented to be the

bargain—a plea to which she in fact had never agreed. Thus, it is impossible to conclude, as the majority so facilely does, that Fox voluntarily withdrew her plea. Indeed, Fox's request to withdraw was coerced by the State's repudiation of the bargain. If not for the State's actions, she in all likelihood would not have filed the motion to withdraw, and even if she had, the withdrawal would have been unlawfully coerced or, to put it differently, unknowing, uninformed, and involuntary.

Finally, the state court cannot be excused from its duty to consider, and ultimately, grant specific performance as a remedy simply because another ground existed for withdrawal separate and apart from the State's breach regarding its promise of parole after seven and one-half years. The court withdrew Fox's plea without addressing the State's breach. It did so on the ground that Fox had not been advised of a different parole term required by state law to be included in her sentence: lifetime parole. State law at the time permitted a defendant who had not been advised of the length of the parole term following his release from prison to withdraw his plea. *See In re Carabes*, 144 Cal. App. 3d 927, 928, 933 (Ct. App. 1983). *Carabes* did not, however, address the case in which there has been both a failure to advise the defendant about a term of the plea agreement *and* a breach of the agreement itself; it certainly did not address a case in which the plea had been breached after the defendant had already substantially performed his part of the agreement. Even if Fox could withdraw her plea on the basis of the failure to advise her of the duration of parole, doing so would not provide a constitutionally adequate remedy for the breach of the plea agreement, and would, in effect, allow the State to breach the agreement with impunity.

In my view, the result under the Due Process Clause is clear: when there has been both a breach of the plea agreement and some other, non-constitutional violation, (or even a constitutional one) the state court must consider the violations together in determining the appropriate remedy, or at the least it cannot rule on the remedy for the other violation without also considering the proper remedy for the breach of the plea agreement. *Santobello* clearly states that a defendant *must* be provided with a remedy for the State's breach, and that, in a number of circumstances, withdrawal will not be proper even when the defendant requests it. 404 U.S. at 262–63; *see also id.* at 267 (Douglas, J. concurring). Numerous cases since *Santobello* have held that when a defendant has substantially performed his end of the bargain, withdrawal is no remedy at all. *See, e.g.*, *Cuero*, 2016 WL 3563660; *Brown*, 337 F.3d at 1161. It therefore follows that, when there has been a breach *and* some other procedural plea violation, courts *must* consider whether specific performance is the appropriate remedy, even if withdrawal would be appropriate for the procedural violation alone. Any other result would deny defendants who have performed their part of the bargain the constitutional remedy for the State's breach of the plea agreement to which they are entitled.[16] Here, the

---

[16] It may, of course, be the case that a defendant truly wishes to withdraw his plea, even despite a breach. In such circumstances, a defendant's knowing, voluntary, and intelligent waiver of his constitutional right to specific performance is something that the state courts should consider when devising an appropriate remedy. *See Buckley*, 441 F.3d at 699 n.11 ("[I]n a case in which the state has already received the benefit of the bargain, the harm caused by its breach is generally best repaired by specific performance of the plea agreement, although a defendant may, if he so chooses, elect instead to rescind the agreement and take his chances from there."). A court cannot know whether the defendant has made an appropriate "choice" of withdrawal,

state court failed even to consider the State's breach of the plea agreement, and disposed of Fox's claim solely on the basis of the procedural violation. In doing so, it deprived Fox of her right to due process of law.

Two years after the state superior court revoked Fox's plea agreement, the California Supreme Court cautioned lower courts against the very sin committed by the superior court when it withdrew Fox's plea without addressing the State's breach. The court explained that in "any given case, there may be a violation of both the advisement requirement, or the plea bargain, or both" and that when both types of error are present and the defendant has already begun serving his sentence, the defendant's agreement should be specifically enforced, rather than withdrawn because "permitting him to withdraw his guilty plea *cannot* restore the status he enjoyed before sentencing." *People v. Walker*, 819 P.2d 861, 864 (Cal. 1991).[17] Thus, the California Supreme Court belatedly recognized, as a matter of state law, what courts across the country had previously held as a matter of federal constitutional law: when a defendant has substantially performed his end of the bargain, or served a substantial

---

however, if it never informs the defendant of his rights, presents the defendant with his options, and makes the inquiry necessary to determine whether the request for withdrawal is voluntary. In this case, Fox's efforts to enforce the agreement pre-trial demonstrate clearly her preference for enforcement over withdrawal of the plea.

[17] *Walker* was subsequently overruled to the extent that it had held that failure to advise a defendant of restitution where the plea bargain was silent as to restitution was not a breach of the agreement, but merely a failure to advise. *See People v. Villalobos*, 277 P.3d 179, 185 (Cal. 2012) (in bank). That does not affect the result here, however. In fact, it makes the constitutional violation even clearer.

portion of his sentence, withdrawal of the bargain cannot provide the constitutional remedy for the State's breach that due process requires.

The superior court had two opportunities to remedy its failure to provide Fox the constitutional remedy to which she was entitled when, post-*Walker,* Fox filed her pre-trial motions explaining that withdrawal was an inadequate remedy for the breach of her plea. The court failed to take advantage of those opportunities, and instead, without discussing whether the earlier withdrawal was appropriate or constitutional, denied both motions by means of a form order. The court then had a third opportunity when Fox asked for the benefit of her original bargain at sentencing, where she explained that "there is and was no way that allowing her to withdraw her plea" after so many years in prison "was fair or just." The state court again did not correct its prior errors, and instead, sentenced Fox to life imprisonment without the possibility of parole. These orders also were arbitrary and capricious and furthered the State's deprivation of her right to a constitutional remedy for the State's breach of the plea agreement.[18] Moreover, barring commutation of her sentence by the governor, they sealed Fox's fate for life.

### D. The Appropriate Remedy is Now to Grant Fox the Relief She Sought Thirty Years Ago

In short, Fox's plea agreement should never have been withdrawn by the state court. Doing so was contrary to the mandate of *Santobello*, its progeny and due process (as well

---

[18] No prejudice to the court or the State could even arguably have been used to justify the denial of Fox's pre-trial (or even post-trial) motions existed.

as to California law). Further, it allowed the State to breach its agreement with impunity, and instead, forced Fox alone to bear the burden of the State's constitutional errors. That burden is a heavy one. Even though the State originally agreed that the service of a prison sentence of seven and one-half years prior to release on parole was sufficient for the crime to which she pled, Fox will now likely die in prison for that very same conduct.

The majority believes that its decision is unavoidable because even if Fox was, at one point, entitled to specific performance, the time for that remedy has long passed. Once the state court withdrew her plea bargain (whether voluntarily or not), the majority argues, there was no longer an agreement for it to enforce. This decision is in conflict with our recent decision in *Cuero v. Cate*, in which we granted specific performance after a plea had already been withdrawn. Even absent the existence of *Cuero*, however, I do not believe that the fundamental fairness that due process requires can be so simply disregarded in the guise of adherence to a prior unfair and unconstitutional judicial action. An injustice cannot become just merely through the State's compounding of its error and the passage of time.

Because the state court withdrew Fox's plea without considering the remedy of specific performance and because withdrawal of her plea was involuntary, Fox was denied the constitutional remedy required for the State's breach. Her subsequent efforts to reinstate and enforce that plea agreement were also unconstitutionally denied. The resulting conviction of Fox for a more serious crime on which the State had promised not to prosecute her cannot stand. Accordingly, this court should now do what should have been done three decades ago: enforce the plea agreement upon which Fox and

the State mutually agreed.  It necessarily follows that we should vacate the conviction on the charge of first degree murder.

Fox, who has served over twenty-five years in excess of the seven and one-half years that she was promised, should be released forthwith.  She has already suffered more than enough from the State's violation of her constitutional rights. I agree that we are incapable of remedying this travesty entirely, because we cannot give Fox back the extra twenty-five years she has spent in prison.  I do not agree, however, that we are unable to prevent the further perpetuation of this inexcusable travesty of justice and become parties to the unprecedented violation of Fox's constitutional rights.  I respectfully dissent.